Maxine **MEHUS**, Plaintiff,

v.

**EMPORIA STATE UNIVERSITY,** Defendant.

No. CIV.A. 03–2066–KHV.

United States District Court, D. Kansas.

June 30, 2004.

Anne W. Schiavone, Kansas City, MO, R. Denise Henning, Stephen R. Bough, Henning & Bough, PC, Kansas City, MO, for Plaintiff.

Malcolm R., Lawrence, KS, William Scott Hesse, Office of Attorney General, Topeka, KS, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff Maxine Mehus, head volleyball coach at Emporia State University ("ESU"), alleges that ESU has violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.[1] Specifically, plaintiff alleges that ESU has paid her less than similarly situated male counterparts for equal work which requires similar effort, skill and responsibility, performed under similar working conditions, in violation of the EPA. Plaintiff also claims that in viola-

tion of Title VII, ESU subjected her to different terms, conditions and privileges of employment than similarly situated male colleagues by (1) providing her a ten-month appointment while providing 12–month appointments to similarly situated males; (2) requiring her to teach while not requiring similarly situated males to do so; (3) providing fewer resources to her team; and (4) paying her less than similarly situated males for equal work which requires substantially similar skill, effort and responsibility. This matter comes before the Court on defendant's *Motion For Summary Judgment* (Doc. # 86) filed March 5, 2004; *Plaintiff's Motion In Limine To Strike Defendant's Expert Lamar Daniels' [sic] Report And Testimony And Suggestions In Support* (Doc. # 99) filed March 22, 2004; and *Plaintiff's Motion In Limine To Strike Defendant's Expert David Faurot's Report And Testimony And Memorandum In Support* (Doc. # 102) filed April 5, 2004. For reasons stated below, the Court sustains defendant's motion in part, sustains plaintiff's motion to strike Daniel's report and testimony, and overrules plaintiff's motion to strike Faurot's report and testimony.

### I. Plaintiff's Motions In Limine To Strike Expert Reports And Testimony

Rule 702 allows expert testimony, by opinion or otherwise, if the witness is qualified as an expert by knowledge, skill, experience, training or education, and his specialized knowledge "will assist the trier of · fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible if it is both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The Court has broad discretion in deciding whether to admit

---

1. On January 23, 2004, plaintiff dismissed her claim under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq. *Dismissal Without Prejudice Of Count IV Of Plaintiff's Complaint* (Doc. # 70); *see also Stipulation Of Dismissal Without Prejudice Of Count IV Of Plaintiff's Complaint* (Doc. # 84) filed March 4, 2004. On March 5, 2004, ESU filed its

motion for summary judgment on plaintiff's remaining claims. (Doc. # 86). Eleven days later, on March 16, 2004, plaintiff dismissed her claim that ESU subjected her to a hostile work environment in violation of Title VII. *Stipulation Of Dismissal Without Prejudice Of Count II Of Plaintiff's Complaint* (Doc. # 96).

expert testimony. *See Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

Rule 702 was amended in December of 2000, in response to *Daubert v. Merrell Dow Pharms., Inc.* and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael.* Rule 702 now provides that expert opinion testimony is admissible "if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." As a practical matter, the focus is on principles and methodologies, not the conclusions generated. If an expert reaches conclusions that other experts in the field would not reach, however, the trial court may fairly suspect that the principles and methods have not been faithfully applied. Fed.R.Evid. 702 advisory committee notes (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir.1996)). The Court must therefore look at the facts underlying the opinion, the methodology, and the link between the facts and the conclusion drawn. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999). The expert's opinion must rest on a "reliable foundation." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786.

The touchstone of Rule 702 is helpfulness of the expert testimony, a condition that goes primarily to relevance. *See BioCore Inc. v. Khosrowshahi*, 183 F.R.D. 695, 699 (D.Kan. 1998) (quoting *Miller v. Heaven*, 922 F.Supp. 495, 501 (D.Kan.1996)). Thus, the Court must determine whether the proffered evidence would be helpful to the trier of fact. *See BioCore*, 183 F.R.D. at 699. In so doing, the Court examines specific subject areas of proposed expert testimony to ascertain whether each is sufficiently tied to the facts of the case so that it will be helpful to the fact finder. *See id.* Any doubts should be resolved in favor of admissibility. *See id.*

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir.1999). To determine whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R.Evid. 702. Second, the Court must determine whether his opinions are reliable under the principles set forth under *Daubert* and *Kumho*. In determining whether a theory is reliable, the Court may consider several non-dispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant community. *Kumho*, 526 U.S. at 149, 119 S.Ct. 1167. These factors, however, are not exclusive and may not apply in some cases. *See* Fed.R.Evid. 702 advisory committee's notes.

As noted, Rule 702 imposes on a district court a gatekeeper obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. Fulfilling the gatekeeper duty requires the judge to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts. *Id.* at 592–93, 113 S.Ct. 2786. The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149, 119 S.Ct. 1167 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786).

### A. *Lamar Daniel*

ESU has designated Lamar Daniel, a Title IX/gender equity consultant, as an expert in this case. The record does not contain the expert designation, or any expert report which Daniel prepared for purposes of this litigation. Therefore the Court has scant information about the purpose for which ESU intends to call him and what opinions he might express that would be relevant to this case. Daniel has prepared a

report which (for reasons independent of this litigation) "addresses the compliance status of ESU with the athletic provisions of Title IX ... and its implementing regulation." *Title IX Compliance Report For Emporia State University* at 1–5, Exhibit A to *Plaintiff's Motion In Limine To Strike Defendant's Expert Lamar Daniels' [sic] Report And Testimony And Suggestions In Support* ("*Motion To Strike Daniel*") (Doc. # 99) filed March 22, 2004; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* Plaintiff seeks to preclude this report, which examines (1) effective accommodation of student interests and abilities; (2) athletic financial assistance; and (3) equal opportunity and the equivalence standard under Title IX. The report opines that ESU is in substantial compliance with Title IX and that "ESU is the most cohesive athletic program that [Daniel has] ever reviewed."[2] *Id.* at 8–27. These opinions are based on ESU data and information obtained during an onsite review, *i.e.* review of facilities, interviews of head coaches (except volleyball), an interview of the first assistant volleyball coach, and interviews of ESU administrators, support staff and women student-athletes. Daniel does not specify what data he used and he attaches no information on which he relied in forming his opinions. The report does not list Daniel's qualifications, the compensation which ESU paid for his study or Daniel's service as an expert, or other cases in which Daniel testified as an expert within the last four years.

Plaintiff asks the Court to strike Daniel's report and anticipated testimony, arguing that since she has dismissed her Title IX claim, they are not relevant or probative. *Motion To Strike Daniel* (Doc. # 99). ESU responds that Daniel's report and opinions are relevant to its EPA defense that any pay disparity between plaintiff and other ESU coaches was based on a factor other than sex, *i.e.* compliance with Title IX. *See Pretrial Order* (Doc. # 105) at 17 ("[ESU] takes into consideration Title IX in decisions regarding salaries of the coaches of its teams").[3] ESU also argues that Daniel's report and opinions are relevant to its Title VII defense, *i.e.* that compliance with Title IX is a legitimate, non-discriminatory reason for any pay disparity between plaintiff and her male colleagues. *See Pretrial Order* (Doc. # 105) at 19. Plaintiff replies that Daniel is a Title IX expert, not an EPA or Title VII expert, and that compliance with Title IX is not a "factor other than sex" under the EPA or an affirmative defense under Title VII. *Plaintiff's Reply To Defendant's Opposition To Plaintiff's Motion In Limine To Strike Defendant's Expert Lamar Daniels [sic] Report And Testimony And Memorandum In Support* (Doc. # 110) filed April 23, 2004.

As noted above, the sole issues in this case are whether ESU violated the EPA and discriminated against plaintiff in violation of Title VII. Daniel's report analyzes Title IX compliance issues. He does not purport to be an EPA or Title VII expert, and he does not address either of these statutes or any recognized defenses thereto. In fact, Daniel's report does not directly discuss compensation of ESU coaches or any of the issues raised by plaintiff's Title VII claim (appointment terms, teaching duties or compensation of head coaches). Daniel does discuss assignment, qualification and compensation of coaches, and opines that the assignment and

2. Daniel opines that ESU should conduct a survey of student interest in athletics at least every two years; that ESU provides financial assistance to men and women athletes in substantial proportion to their participation; that ESU has no discriminatory policies related to its athletic program and no substantial sex-based disparities which affect benefits, treatment, services or opportunities provided to athletes; and that no disparities exist in individual program components.

3. Specifically, ESU contends that Daniel's Title IX compliance report is relevant to (1) plaintiff's allegation that her teaching responsibility affected her ability to do coaching duties; (2) how NCAA recruiting rules affect volleyball and basketball coaches; (3) whether ESU discriminates against plaintiff by not selling tickets to volleyball games; (4) whether ESU sufficiently promotes volleyball; and (5) whether volleyball and basketball coaches at ESU have different job duties and whether such differences are caused by discrimination. *Opposition To Plaintiff's Motion In Limine To Strike Defendant's Expert Lamar Daniels [sic] Report And Testimony And Suggestions In Support* (Doc. # 103) filed April 8, 2004.

compensation of coaches is "equivalent." [4] Specifically, he states that ESU is in compliance with Title IX regarding salaries because he finds no difference in the availability or qualifications of coaches which have a disparate impact on athletes and no problem with delivery of coaching services to athletes. Exhibit A at 15.

ESU argues that compliance with Title IX is an affirmative defense to EPA liability and a legitimate non-discriminatory reason for purposes of Title VII, and that Daniel's testimony is relevant to both issues. ESU cites no legal authority for this proposition, and it has not articulated a factual or legal scenario under which compliance with Title IX could justify a pay disparity or other differential treatment which would otherwise violate the EPA or Title VII. In other words, ESU has not articulated a factual or legal basis for its position that compliance with Title IX requires or permits it to violate the EPA or Title VII. Indeed, Daniel does not invoke Title IX to justify any EPA or Title VII violation.

Under Rule 26, expert disclosures must be accompanied by a written report prepared and signed by the witness. The expert report must contain a complete statement of all expert opinions and bases and reasons therefor; the data and information considered by the expert; any exhibits to be used as support for or a summary of the opinions; the qualifications of the expert and all publications authored by the expert in the past ten years; the expert's compensation for his review and testimony; and a list of all other cases in which the expert has testified at trial or at deposition in the past four years. Rule 26(a)(2)(B), Fed.R.Civ.P. The burden of proving admissibility of expert testimony is on the party proffering such testimony. *See Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786; *United States v. Williams*, 95 F.3d 723, 729 (8th Cir.1996), *cert. denied*, 519 U.S. 1082, 117 S.Ct. 750, 136 L.Ed.2d 687 (1997). ESU has not met this burden. Daniel's report and opinion appear to have slight relevance, if any, to the issues in this case. Their probative value is substantially outweighed by the danger of unfair prejudice,

confusion of issues, misleading the jury and waste of time. The report and testimony are therefore excluded under Rule 403, Fed. R.Evid.

## B. *David Faurot*

ESU is a member of the Mid–American Intercollegiate Athletic Association ("MIAA") and Division II of the National Collegiate Athletic Association ("NCAA"). The MIAA consists of ten schools: ESU, Washburn University, Pittsburg State University, Central Missouri State University, Truman State University, Southwest Baptist University, Northwest Missouri State University, Missouri Western State College, Missouri Southern University, and the University of Missouri at Rolla. All MIAA universities have teams for football, men's basketball and women's basketball. Nine MIAA universities (all except the University of Missouri at Rolla) have volleyball teams.

On an annual basis, MIAA universities must submit to the NCAA a Gender Equity Survey ("GES") which summarizes coach salaries and spending by sport. As an expert witness, ESU has designated David Faurot, an economist who prepared an analysis of GES data from MIAA universities between 1998 and 2002. Faurot's report compares (1) the salaries of plaintiff and other MIAA head coaches and (2) the amount that ESU and other MIAA universities spend on each sport. *Expenditure And Coach's Salary In Emporia State University Volleyball*, Exhibit A to *Plaintiff's Motion In Limine To Strike Defendant's Expert David Faurot's Report And Testimony And Suggestions In Support* (Doc. # 102) filed April 5, 2004. The analysis reveals that (1) salaries differ by sport and institution; (2) head coach salaries for volleyball are lower than head coach salaries for football and men's and women's basketball; and (3) in 2002, plaintiff received the third highest head volleyball coach salary in the MIAA. According to the report, Faurot's opinion is that (1) different salaries "imply" different labor markets for coaches in different sports; (2) ESU paid plaintiff a salary which was higher than would be pre-

---

4. Daniel does not explain how the assignment

and compensation of coaches is equivalent.

dicted by linear regression analysis; and (3) there is no evidence of discrimination against plaintiff.

Plaintiff does not contest Faurot's qualifications as an economist. Rather, she asks the Court to strike his report and anticipated testimony, arguing that (1) jurors will receive relevant portions of the GES surveys and do not need his summary; and (2) his opinions do not meet the requirements of Fed.R.Evid. 702 since they are not based on scientific, technical or other specialized knowledge which will assist the trier of fact. Plaintiff also complains that those portions of Faurot's report and anticipated testimony which address Title IX are irrelevant since she has dismissed her Title IX claim. *Motion To Strike Faurot* (Doc. # 102) at 3.

The Court overrules plaintiff's motion to exclude Faurot's summary of GES survey data. Plaintiff does not dispute its accuracy, and under Rule 1006, Fed.R.Evid., "[t]he contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a ... summary." A summary will presumably help the jury evaluate the GES survey results, and plaintiff cannot realistically claim to be prejudiced by an accurate summary of survey data.[5]

If they are both relevant and reliable, and based on scientific, technical, or specialized knowledge which will assist the jury, the Court may admit Faurot's opinions that (1) different salaries imply different labor markets for coaches in different sports; (2) ESU paid plaintiff a salary which was higher than linear regression analysis would predict, and (3) there is no evidence of discrimination against plaintiff. *See Kumho*, 526 U.S. at 141, 119 S.Ct. 1167(citing *Daubert*, 509 U.S. 579, 113 S.Ct. 2786). ESU need not establish that Faurot is undisputably correct, but it must show that the method which he employed in reaching each conclusion is "scienti-

fically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell*, 165 F.3d at 781 (citations omitted).

### 1. Salary Differences "Imply" Different Labor Markets

From GES survey data, Farout finds that MIAA head coach salaries for football, men's basketball, women's basketball and volleyball have differences which "are large and statistically significant," and "imply that there is a different labor market for coaches in volleyball than in men's basketball, women's basketball, and football."

[2] Expert opinions may be based on education, training and experience, combined with reliance on reports, depositions or other information related to the particular circumstances, but an expert must explain factually why and how he reached his conclusions. *Hilt v. SFC Inc.*, 170 F.R.D. 182, 185 (D.Kan. 1997). The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation." *Mitchell*, 165 F.3d at 780.

Faurot's report does not explain the methodology which he employed in forming this opinion, or explain that it is grounded in methods and procedures which are accepted in his field. By the same token, plaintiff advances no credible argument that Faurot did not base his opinion on reliable methodology. Absent a more specific articulation of perceived deficiencies in Faurot's methodology, a *Daubert* hearing would serve no purpose. The Court therefore overrules plaintiff's motion to strike Faurot's report and testimony as to his opinion that salary differences imply different labor markets. If necessary, plaintiff may challenge Faurot's methodology at trial.[6]

5. Among other things, Faurot's report condenses the results of 50 GES surveys into a concise four-page report which will focus the jury on the coach salaries which are relevant to plaintiff's EPA and Title VII claims (volleyball and basketball).

6. Faurot's opinion is that salary differentials "imply" different markets—not that separate markets actually exist—and it is not clear how the salary differentials account for discrimination or lack of discrimination on the basis of sex. In the end, Faurot's opinion may therefore be more speculative than helpful. On this record,

### C. Plaintiff's Salary Is Higher Than Would Be Predicted

■ According to his report, Faurot used linear regression analysis—a statistical tool for understanding the relationship between two or more variables—to "generate predicted salaries for the volleyball coach at [ESU]." Faurot concludes that ESU paid plaintiff a salary which was higher than his linear regression analysis would predict. Plaintiff complains that Faurot does not base this opinion on scientific, technical or other specialized knowledge, and that his opinion is inadmissible because it does not exclude such variables as years of experience and years of coaching.

Regression analysis is a common statistical tool designed to isolate the influence of one particular factor on a depend variable.[7] *E.E.O.C. v. Gen. Tel. Co. of Northwest, Inc.,* 885 F.2d 575, 577 n. 3 (9th Cir.1989) (citation omitted); *see In re Aluminum Phosphide Antitrust Litig.,* 893 F.Supp. 1497, 1503–04 (D.Kan.1995). In *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the Supreme Court established the rule governing admissibility of regression analyses in discrimination cases:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors must be considered unacceptable as evidence of discrimination. Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

*Id.* at 400, 106 S.Ct. 3000 (Brennan, J., concurring in part, joined by all Justices) (citations and quotations omitted). Qualifying this rule, the Supreme Court added that "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant." *Id.* at 400 n. 10, 106 S.Ct. 3000. Plaintiff cannot exclude a regression analysis, however, simply by pointing to variables not taken into account. *See Coward v. ADT Sec. Sys., Inc.,* 140 F.3d 271, 274 (D.C.Cir.1998). Depending on the theory of the case, some variables may be entirely unsuitable. *See id.*

Plaintiff cites no evidence that generally accepted methodology required Faurot to exclude such variables as years of experience and years of coaching. Indeed, nothing in the record suggests that ESU or any other MIAA member considers those factors in determining head coach compensation. Absent such evidence, plaintiff's proposed variables may be simply irrelevant. The Court therefore overrules plaintiff's motion to strike Faurot's opinion and testimony with regard to his linear regression analysis.

### D. No Evidence Of Discrimination

■ Faurot sees no evidence of discrimination against plaintiff. His opinion on this subject is not one that will help the jury. Whether plaintiff has evidence of discrimination is a question for the Court and the jury. The Court therefore sustains plaintiff's motion to strike his report and testimony regarding that opinion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than

---

however, the Court is unable to determine the reliability of his opinion.

7. Professors Baldus and Cole define regression analysis as:

> The use of an algebraic formula to express the influence of one or more independent variables (*e.g.,* racial status . . .) on the average level of a dependent variable (*e.g.,* selection rate . . .). Also the computational procedure through which the terms of this formula are estimated.

D. Baldus & J. Cole, *Statistical Proof of Discrimination,* 357 (1980).

a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Factual Background

For purposes of defendant's motion for summary judgment, the following facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff.

ESU is a member institution of the Kansas Board of Regents which is established by Article 6 of the Kansas Constitution. Plaintiff, who has a master's degree, became the ESU head women's volleyball coach in 1988.[8] Plaintiff has 24 years of volleyball coaching experience and receives the second or third highest salary of all MIAA volleyball coaches.[9] Plaintiff's volleyball teams have never won an MIAA championship, participated in the NCAA Division II championship tournament or hosted the NCAA national tournament. In 2003, however, the team finished fourth in conference and the only teams that finished above ESU were nationally ranked. In 2003, the American Volleyball Association also gave ESU a national award for academic excellence. In 1994, ESU won the National Invitational Tournament.

Plaintiff has never coached a professional or Olympic team or been named MIAA volleyball coach of the year. ESU was a member of the National Association of Intercollegiate Athletics ("NAIA") before it joined the NCAA, however, and the NAIA named plaintiff District 10 volleyball coach of the year four times. Plaintiff has coached in the NCAA since 1992 and is ranked fifth in NCAA wins.

Plaintiff's duties include (1) coaching the volleyball team; (2) taking care of all organizational, scholarship, budget, recruiting, public relations and fund raising regarding the volleyball team; (3) supervising an assistant coach and graduate assistant and monitoring the volleyball team; and (4) all other items entailed or involved in coaching volleyball. Plaintiff also finds score-keepers, linesmen and individuals to run the home matches. The ESU athletic department has offered to help plaintiff find people for those jobs, but she has declined their help. The coaches of

---

8. ESU does not have a men's volleyball team.

9. Faurot claims that plaintiff received the third highest salary of all MIAA head volleyball coaches in 2002, Attachment 30 to *Defendant's Memorandum* (Doc. # 87), and ESU President Kay Schallenkamp claims that plaintiff is the second highest paid of all MIAA head volleyball coaches. Attachment 26 to *Defendant's Memorandum,* at 95. Plaintiff does not dispute either contention. *Plaintiff's Response* (Doc. # 101) at 48.

football, men's basketball and women's basketball do not have to find people to run their home games.

In addition to coaching, plaintiff has been required to teach courses in fundamentals of volleyball in fall semesters and (until this year) fundamentals of softball in spring semesters. Plaintiff teaches class twice a week, and each class lasts about one hour and twenty minutes. Plaintiff has the same responsibilities as every other professor and must report to her supervisor, the head of the department of Health, Physical Education and Recreation ("HPE & R"). In addition to teaching the class, she is responsible for course preparation, which includes preparing a course outline, syllabus, course materials, quizzes and exams, and grading. ESU does not pay plaintiff any separate salary for teaching.

On unspecified dates, plaintiff asked Kent Weiser and Bill Quayle, the current and former athletic directors, and Kathy Ermler, who supervised plaintiff's teaching, to relieve her of teaching responsibilities so she could devote more time to fund-raising for volleyball. In the spring of 2004, ESU did relieve plaintiff of teaching responsibility for softball and assigned that duty to Stacy Gemeinhardt, the women's softball coach. ESU did not act on plaintiff's request to be relieved from teaching volleyball. In some years, ESU has "bought out" the teaching contracts for the football, men's basketball and women's basketball coaches, and created a position in HPE & R to take over the hours not taught by those coaches.[10]

Since 1999, plaintiff has supervised one assistant coach and one graduate assistant. In 2002, the volleyball team had 14 players and awarded $41,393 in scholarships. In 2001, the team had 14 players and awarded $40,686 in scholarships. In 2000, the team had 16 players and awarded $40,686 in scholarships. In 1999, the team had 14 players and awarded $34,596 in scholarships.

The estimated number of fans who attended home volleyball games is as follows:

| Season | Attendees |
| --- | --- |
| 2002–2003 | 2084 (189 per game) |
| 2001–2002 | 1829 (183 per game) |
| 2000–2001 | 2145 (195 per game) |
| 1999–2000 | 2603 (153 per game) |
| 1998–1999 | 2552 (142 per game) |
| 1997–1998 | 2198 (244 per game) |

As noted, GES surveys report coach salaries and annual spending by sport. Within the MIAA, ESU volleyball ranks fourth in average spending and third in average winning percentage. Peggy Martin, head volleyball coach at Central Missouri State University, has 27 years of volleyball coaching experience and receives the highest salary of any MIAA volleyball coach. Martin earned $65,000 for the 2003–2004 academic year and will receive $75,000 for the coming year. Martin has 892 wins as head volleyball coach—more than any other NCAA Division II coach. Martin has won or shared 19 MIAA championships and her teams have been invited to the NCAA Division II championship tournament 20 times, winning six regional tournaments. Plaintiff earned $46,499 in 2003–2004 and $46,160 in 2002–2003. According to Faurot, plaintiff's salary is higher than linear regression analysis would predict from the salaries of other MIAA coaches.

## I. Other Coaches And Sports At ESU

### A. *Appointment Terms*

The ESU President appoints all ESU employees through Notices of Appointment for either ten or 12 months. An employee on a ten-month appointment has eight weeks during which he or she does not receive a pay check. An employee on a 12–month appointment receives pay checks for the entire year, with two or three weeks of paid leave. Plaintiff has a ten-month appointment which runs from the end of July through the end of May

---

**10.** Plaintiff explained that before ESU joined the NCAA, Bill Quayle was both Athletic Director and division chair of HPE & R, and football, basketball and volleyball coaches had to teach. After ESU joined the NCAA, HPE & R separated from the Athletic Department, and ESU bought out the teaching contracts for football and basketball coaches then created positions in HPE & R to take over the hours that those coaches had previously taught. *Mehus Deposition* at 88–90, Exhibit A to *Plaintiff's Response* (Doc. # 101). ESU was suppose to phase all coaches out of the classrooms, but because of tight budgets, it has not yet done so. *Id.* at 91.

of the following year.[11] Plaintiff is the only Division II volleyball coach in Kansas with a ten-month appointment.[12] Five other ESU coaches hold ten-month appointments: David Harris, track and field and cross country; Shawn Siegele, tennis; Ivan Huntoon, soccer; Stacy Gemeinhardt, softball; and Bob Fornelli, baseball. In the past, other coaches also held ten-month appointments: Brian Embery, baseball from 1997 to 2003; George Milton, tennis from 1997 to 1999; Darrell Phillips, tennis from 1999 to 2000; and JoLana Kord, softball from 1997 to 2002. All head coaches for football and basketball hold 12–month appointments. Except for one assistant football coach (Larry Wiemers), all assistant coaches for football and basketball also have 12–month appointments.

### B. Coach Salaries

ESU has no policy with respect to starting salary for head coaches; it uses a so-called deliberative process to establish each coach's salary. As athletic director, Kent Weiser makes salary recommendations to the ESU President for all head coaches. In making these recommendations, he considers available funding, the coach's credentials and the market value of the position.

ESU does not have a seniority system for head coaches, and it has no written policy to determine raises for head coaches. Raises are subject to approval by President Shallenkamp, who testified that to determine raises, ESU uses a merit system based on annual evaluations, then makes market and equity adjustments. *Videotape Deposition Of Kay Shallenkamp* at 47–49, Attachment 1 to *Reply To Plaintiff's Response To Defendant Emporia State University's Motion For Summary Judgment* (Doc. # 104) filed April 12, 2004. Weiser, however, testified that he was not aware of a merit system with respect to head coaches. *Id.* at 30. In the past two or three years ESU has gone through a budget crisis and all salary increases have been across-the-board percentage raises.

Budget and funding decisions for coaches and teams are based on ESU's policy of fielding competitive teams in parity with its competition in the MIAA. In recent years, ESU football, basketball and volleyball coaches have received the following salaries:

| Coach | Sex of Coach | Sport | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
|---|---|---|---|---|---|---|
| Wiemers | Male | Football | | $63,000 | $63,000 | $63,000 |
| Schneider | Male | Women's Basketball | $42,042 | $59,540 | $60,880 | $61,327 |
| Moe | Male | Men's Basketball | | $12,463 [13] | $60,008 | $60,008 |
| Mehus | Female | Volleyball | | $45,144 | $46,160 | $46,499 |

The record does not specify the salaries of other coaches (softball, baseball, track and field, cross country, soccer and tennis) or what classes (if any) they teach. GES survey data contain salary information for each coach of each sport, but they do not always correspond to the amounts that the parties agree ESU paid Wiemers, Schneider, Moe and plaintiff.

11. Between the spring of 1998 and the fall of 1999, plaintiff asked interim athletic director Shawn Shoemaker to change her appointment to a 12–month appointment. Shoemaker relayed plaintiff's request to President Shallenkamp, who replied that ESU would leave the determination to its new athletic director. ESU hired Kent Weiser as athletic director in the fall of 1999, and plaintiff did not ask him to change her appointment term. Weiser became aware of plaintiff's wishes however, when plaintiff made a complaint to the ESU grievance committee at some point prior to October 30, 2001.

12. The record does not reveal all of the other volleyball coaches in Kansas, but other MIAA coaches in Kansas would include those at Washburn University and Pittsburg State University.

13. Moe only worked 11 weeks in FY 2001.

## C. Other Sports At ESU [14]

### 1. David Wiemers—Football

The record does not disclose Wiemers' credentials, but in 2001, ESU hired him as head football coach on a 12–month appointment. ESU requires Wiemers to teach and assigns him a $1,500 for those duties, but allows him to assign his teaching duties to David Hafner, an assistant coach.[15]

During 2002, Wiemers supervised five full-time assistant coaches, two part-time assistant coaches and two graduate assistants. During 2001 and 2000, Wiemers supervised eight assistant coaches. During 2002, the team had 97 players. It had 93 players in 2001 and 102 players in 2000. For the NCAA reporting year which ended October 15, 2003, the team awarded $329,621 in scholarships. For the NCAA reporting year which ended October 15, 2002, the team awarded $295,739 in scholarships. For the NCAA reporting year which ended October 15, 2001, the team awarded $300,731 in scholarships.[16]

The estimated number of fans who attended home football games is as follows:

| Season | Attendees |
| --- | --- |
| 2002 | 28497 (5699 per game) |
| 2001 | 30251 (5042 per game) |
| 2000 | 25964 (5193 per game) |
| 1999 | 30347 (5058 per game) |
| 1998 | 29742 (5948 per game) |
| 1997 | 21389 (4278 per game) |

The ESU football program ranks seventh in spending and fifth in winning percentage in the MIAA. In 2002 the ESU football team won the Mineral Water Bowl. In 2003 it was co-champion of the MIAA and was invited to the NCAA Division II football championship playoffs.

### 2. Brandon Schneider—Women's Basketball

Schneider, who has a bachelor's degree, has been coaching at the college level for nine years. ESU hired Schneider as head coach for women's basketball in the fall of 1999. He has no teaching responsibilities. After his first year at ESU (presumably in 2000), the University of Missouri offered Schneider an associate coach position. Its offer included a salary of $95,000, use of a sports utility vehicle provided by a local automobile dealership, a country club membership, a University golf club membership, a $10,000 basketball camp salary, two Tiger Lounge football tickets, a $30.00 per month gasoline allowance, and two tickets to men's basketball games. *Affidavit Of Cindy Stein* ¶ 13, Attachment 32 to *Defendant's Memorandum* (Doc. # 87). Schneider chose to stay at ESU because of his "kids," support from the community and the administration, and his desire to continue as a head coach.[17] For 2001, ESU adjusted Schneider's salary—increasing it from $42,042 to $59,540. ESU states that the adjustment was "based upon free market forces," a statement which plaintiff does not dispute.

Throughout his tenure, Schneider has supervised one full-time assistant coach and one graduate assistant. During the 2002–2003 season the team had 11 players and awarded $93,055 in scholarships. During the 2001–2002 season, the team had 16 players and awarded $86,782 in scholarships. Dur-

14. The record regarding other sports is basically focused on football, women's basketball and men's basketball. Information regarding other coaches is extremely limited. The record reveals that David Harris, who is head coach of men's and women's track and field and cross country, also teaches at ESU, and that Stacy Gemeinhardt, women's softball coach, taught fundamentals of coaching softball during the spring semester of 2004. In 1999, ESU hosted the NCAA Division II National Outdoor Track and Field Meet. Harris was instrumental in getting the tournament to ESU. In 1996, ESU hosted the NCAA National Softball Tournament. Jo Kord, former head softball coach, was instrumental in getting that tournament to ESU.

15. Presumably, ESU "buys out" that part of Weimers' contract and pays the $1,500 to Hafner.

16. Jerry Kill, Wiemers' predecessor, supervised eight assistant coaches during 1999. At that time the team had 100 players and awarded $267,750 in scholarships.

17. The record does not reveal whether Schneider was referring to his children or to student athletes. Plaintiff claims that he was referring to biological children and ESU claims that Schneider has no children. Neither position is supported by a citation to record evidence.

ing the 2000–2001 season, the team had 11 players and awarded $83,309 in scholarships. During the 1999–2000 basketball season, the team had 13 players and awarded $72,231 in scholarships.

The estimated number of fans who attended home women's basketball games is as follows:

| Season | Attendees |
|---|---|
| 2002–2003 | 27612 (1972 per game) |
| 2001–2002 | 23436 (1674 per game) |
| 2000–2001 | 33567 (2098 per game) |
| 1999–2000 | 41063 (2281 per game) |
| 1998–1999 | 37655 (1883 per game) |
| 1997–1998 | 37984 (2234 per game) |

Schneider was MIAA women's basketball coach of the year for 2001 and 1999. The ESU women's basketball program ranks fourth in spending and first in winning percentage in the MIAA. In 2001, women's basketball had an operating budget of $51,000. Schneider, however, spent $72,280.11—more than $20,000 over budget.

For the last four years, the women's basketball team has been regular season conference champion. In 2004, it was seeded first in the MIAA post-season tournament. In 2003, it participated in the NCAA Division II basketball tournament. From 1999 to 2001, it was MIAA women's post-season tournament champion. It has been NCAA south-central regional runner-up (2001), and south-central regional champion (1999 and 2000). It participated in the NCAA Division II

"Elite Eight" in 2000, and "Final Four" in 1999.

### 3. David Moe—Men's Basketball

Moe, who also has a bachelor's degree, has more than 15 years of college coaching experience.[18] Moe has been men's head basketball coach for three years, and this is his first position as head coach. Moe has no teaching responsibilities.

Moe took a salary cut to accept the head coaching position at ESU and he did not receive a salary increase in 2002 or 2003. Moe has parlayed his contacts with NCAA Division I schools to allow ESU to play schools such as Gonzaga and Wichita State University for guaranteed contracts which help the bottom line of the ESU Athletic Department.[19]

The men's basketball program ranks tenth in spending and eighth in winning percentage in the MIAA. Moe was the MIAA men's basketball coach of the year in 2003. Since 2002, he has supervised one full-time assistant coach and one graduate assistant. During 2002–2003, the team had 17 players and awarded $90,247 in scholarships. During 2001–2002, the team had 15 players and awarded $88,331 in scholarships.[20]

The estimated number of fans who attended men's home basketball games is as follows:

18. From 1993 to 1994, Moe was assistant basketball coach at the University of Colorado, which paid him a $61,000 salary, a camp salary of $4,000, and a $5,000 bonus for the 2000–2001 season. It also gave him two season tickets for football, two single-game football tickets for the 2001 game at Kansas State, four men's basketball season tickets and ten Big XII Tournament tickets. Before he coached at the University of Colorado, Moe was assistant coach for the Philadelphia 76ers—an NBA team. Moe's position with the 76ers was contingent on the employment of the head coach, and Moe was fired when the head coach was fired. Moe has also served as an assistant coach at Texas Tech and the University of Kansas.

19. Plaintiff disputes this fact, arguing that ESU provides no evidence to support this factual contention. The record, however, contains depositions of Moe and Weiser. Moe testified that ESU played these games and received money for them

because of his relationships and contacts. *Videotape Deposition Of David Moe* at 74, Attachment 27 to *Memorandum In Support Of Defendant's Motion For Summary Judgment* (Doc. # 87). Weiser also stated that Moe secured these two games. *Videotape Deposition Of Kent Weiser* at 94, Attachment 28 to *Memorandum In Support Of Defendant's Motion For Summary Judgment* (Doc. # 87).

20. Moe's predecessor, Marc Comstock, also supervised one full-time assistant coach and one graduate assistant. In 2000–2001 the team had 16 players and awarded $83,174 in scholarships. In 1999–2000, the team had 13 players and awarded $71,231 in scholarships. Ron Slaymaker taught fundamentals of basketball while he was head coach of men's basketball. After Slaymaker retired as head coach, he continued to teach. He is scheduled to retire from teaching in July of 2004.

| Season | Attendees |
|--------|-----------|
| 2002–2003 | 29373 (1958 per game) |
| 2001–2002 | 16871 (1406 per game) |
| 2000–2001 | 17890 (1193 per game) |
| 1999–2000 | 20478 (1280 per game) |
| 1998–1999 | 20707 (1380 per game) |
| 1997–1998 | 19122 (1471 per game) |

### D. ESU Coach Duties

ESU does not have written job descriptions for each head coach, but an old staff manual contains a generic job description for all head coaches. The manual states that "the extent of time, difficulty and skill required to perform the following duties can vary significantly from sport to sport." Subject to that caveat, the manual states that

[T]he major areas of responsibility and authority of all the head coaches at Emporia State University identified below are:

1. Recruitment, selection, and preparation of team.

2. Supervision of assistant coaches, team managers, and other personnel assigned to the sport program.

3. Public relations for the sport and athletic programs.

4. Recommend to the Director of Athletics the schedule for contests and opponents and make arrangements for contests as approved by the Director.

5. Teach in accordance with assigned load during the academic year.

6. Assist in appropriate fund-raising activities as approved or assigned by the Director of Athletics and the Foundation for the sport and Intercollegiate Athletics.

7. Manage the sport program within budget allocation.

8. Delegate authority and responsibility to assistant coaches, managers, and captains.

9. Maintain contact with alumni players.

10. Conduct appropriate scholarly and service activities normally expected of faculty assigned to athletic responsibilities.

11. Conduct the sport program in total compliance with rules and regulations of the national and conference affiliates.

12. Other duties assigned.

Coaches are also expected to maintain positive relationships with a broad spectrum of university personnel. Specific relationships are:

1. Work with Sports Information Director and University Relations staff to meet statistical needs, public relations, and promotional objectives of Intercollegiate Athletics.

2. Work with the ESU Foundation staff to meet fund-raising objectives.

3. Work with alumni staff to met [sic] alumni-relations objectives.

4. Work with the Chair of HPER for academic teaching assignments.

5. Work with the other coaches to meet the objectives of the total Intercollegiate Athletic Program.

6. Work with team physician and athletic trainers to enhance the prevention, care, and treatment of athletic injuries.

7. Work with the coordinator of facility scheduling to confirm needed facilities.

8. Work with the Admissions Office staff to correctly process recruited student athletes.

9. Work with the faculty athletics representative in carrying out the mission and objectives of Intercollegiate Athletics.

10. Work with the athletic/academic counselor to ensure proper compliance with university, conference, and national affiliate regulations.

11. Work with athletic compliance coordinator to ensure proper compliance with university, conference, and national affiliate regulations.

12. Coaches are accountable and report to the Director of Athletics.

*Plaintiff's First Interrogatories To Defendant Emporia State University* Exhibit C to *Plaintiffs' [sic] Response To Defendant's Motion For Summary Judgment ("Plaintiff's Response")* (Doc. # 101) filed March 26, 2004. Fans and donors expect to have access

to head football and basketball coaches at all times.

ESU has a Winning Edge Account which contains funds that can be withdrawn to cover over-budget expenditures by a program. Head coaches have never been responsible for raising specific amounts of revenue, but if they want extras things, they have to help raise the money.

Football, men's basketball and women's basketball are broadcast on the radio and as part of their duties, the head coaches conduct pre-game and post-game shows for all broadcasts during the season. They also participate in "Hornet Talk" and "Saturday Morning Sports Talk" radio programs.

Volleyball games are not broadcast on the radio. Plaintiff does not have broadcast responsibilities, but she is available for pre-game and post-game interviews and she makes some post-game comments that are broadcast. She also conducts post-game interviews at home.

Coaches must abide by NCAA rules concerning recruiting. The NCAA has separate rules and recruiting calendars for football and basketball, and these rules are more complicated than those for volleyball and other sports. Because of differences in NCAA rules and operational budgets and funds for recruiting, football and basketball also have different recruiting methods. In Division II sports other than football and basketball, coaches may recruit any time except during the 48 hours prior to 7:00 a.m. on the initial date for the spring and fall signing of the National Letter of Intent. Attachment 7 to *Memorandum In Support Of Defendant's Motion For Summary Judgment* (Doc. # 87) filed March 5, 2004. Plaintiff is responsible for recruiting during summer months.

### E. *Grievance Committee Recommendations*

At some point prior to October 30, 2001, plaintiff made a complaint to the ESU grievance committee. The record does not specify when or for what specific reason plaintiff made this complaint. On October 30, 2001, however, the ESU grievance committee made the following recommendations with respect to plaintiff's complaint:

Within three years:

(a) create a better definition of "core sports;"

(b) the athletic department should evaluate the job descriptions of all coaching staff, write job descriptions which reflect the individual sports and reevaluate current individuals' positions;

(c) offer 12–month contracts to all coaches who are expected to continue to recruit and sign athletes during the summer months.

As of early 2004, ESU had not implemented any of these recommendations.

### II. Competitive Sports At ESU

In 1997, Bill Quayle was athletic director at ESU. During his tenure, Quayle referred to football, men's and women's basketball, and volleyball as "core sports," and they received preferential funding. Under Weiser, who became athletic director in the fall of 1999, ESU eliminated the "core sports" philosophy. Football, men's and women's basketball and volleyball have nonetheless remained the top-funded sports at ESU.

According to the GES surveys, ESU sports revenues for football, basketball and volleyball have been as follows:

### 1999-2000 REVENUE

| Team | Ticket Sales | Cash Contributions | Institutional Support | Concessions | Program Sales | Signage | TOTAL |
|---|---|---|---|---|---|---|---|
| Football | 58,280 | 47,315 | 169,942 | 9,000 | 3,297 | 16,613 | $304,447 |
| Men Basketball | 38,058 | 24,440 | 85,993 | | 1,865 | 8,306 | $158,662 |
| Women Basketball | 38,058 | 10,610 | 77,067 | | 1,865 | 8,306 | $135,906 |
| Volleyball | | | 58,192 | | | | $58,192 |

### 2000-2001 REVENUE

| Team | Ticket Sales | Cash Contributions | Institutional Support | Concessions | Program Sales | Signage | TOTAL |
|---|---|---|---|---|---|---|---|
| Football | 72,533 | 59,482 | 165,360 | 9,200 | 3,139 | 22,546 | $332,260 |
| Women Basketball | 33,726 | 18,278 | 98,063 | | 1,570 | 11,273 | $162,850 |
| Men Basketball | 33,726 | 11,471 | 83,529 | | 1,570 | 11,273 | $141,569 |
| Volleyball | | 3,019 | 68,315 | | | | $71,334 |

### 2001-2002 REVENUE

| Team | Ticket Sales | Cash Contributions | Institutional Support | Concessions | Program Sales | Signage | TOTAL |
|---|---|---|---|---|---|---|---|
| Football | 56,798 | 38,200 | 165,560 | 12,800 | 2,370 | 24,953 | $310,681 |
| Women Basketball | 36,766 | 28,467 | 96,615 | | 1,185 | 12,476 | $175,509 |
| Men Basketball | 36,766 | 20,135 | 95,273 | | 1,185 | 12,476 | $165,835 |
| Volleyball | | 419 | 70,369 | | | | $70,788 |

### 2002-2003 REVENUE

| Team | Ticket Sales | Cash Contributions | Institutional Support | Concessions | Program Sales | Signage | TOTAL |
|---|---|---|---|---|---|---|---|
| Football | 58,554 | 55,500 | 167,741 | 13,130 | 2,661 | 17,134 | $314,720 |
| Women Basketball | 40,717 | 14,881 | 96,659 | | 1,330 | 8,568 | $162,155 |
| Men Basketball | 40,717 | 11,230 | 95,340 | | 1,330 | 8,568 | $157,185 |
| Volleyball | | 2,136 | 70,427 | | | | $72,563 |

Weiser makes funding decisions and decides which sports are allowed to sell tickets. In funding decisions, he tries to keep each sport competitive with other MIAA schools. In deciding whether to sell tickets, Weiser uses common business sense, *i.e.* a cost-bene-

fit analysis. On an unspecified date, plaintiff asked Weiser to sell tickets for volleyball. When determining whether to do so, Weiser looked at the average number of people who attended games, how many got into athletic events free (students, retired faculty and up to four family or friends of each student athlete), and the cost involved in selling tickets. ESU is one of only two or three MIAA volleyball programs which does not charge admission for games. ESU charges admission for football and men's and women's basketball games, but no other sports. Because ESU does not charge admission for home volleyball games, the volleyball team does not generate revenue from ticket sales.[21]

### Analysis

Plaintiff alleges that ESU has paid her less than similarly situated males for equal work which requires similar effort, skill and responsibility, performed under similar working conditions, in violation of the EPA, 29 U.S.C. § 206(d), and has subjected her to different terms, conditions and privileges of employment than similarly situated males, in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* As to her Title VII claim, plaintiff specifically alleges that ESU (1) gave her a ten-month appointment while giving 12–month appointments to Moe and Schneider; (2) required her to teach while not requiring Moe and Schneider to do so; (3) provided fewer resources to plaintiff's team; and (4) paid plaintiff less than Moe and Schneider for equal work which requires substantially similar skill, effort and responsibility.

ESU seeks summary judgment on all of plaintiff's claims. As to plaintiff's EPA claim, ESU argues that plaintiff cannot make out a prima facie case because (1) she compares herself to three different coaches rather than a single male counterpart; (2) she cannot show that her job is substantially similar to the job of any other coach; and (3)

even if she makes out a prima facie case, ESU has two legitimate explanations for disparate salaries: (a) merit and factors other than sex, and (b) free market forces. As to the latter point, ESU contends that the market salary for volleyball coaches is substantially less than the market salary for MIAA football and basketball coaches. *Defendant's Memorandum* at 35, 36, 46. ESU seeks summary judgment on plaintiff's Title VII claims because (1) she cannot establish a prima facie case of sex discrimination, and (2) even if she can establish a prima facie case, it has legitimate nondiscriminatory reasons for setting contract appointment periods, assigning teaching duties, providing different resources to different sports, and setting and raising coaches' salaries.[22]

Plaintiff responds that she has established a prima facie case of wage discrimination under the EPA by identifying particular comparators (Moe and Schneider) who perform work which is substantially equal to hers, and that genuine issues of material fact preclude a summary determination whether ESU bases coach salaries and raises on merit and factors other than sex. As to Title VII, plaintiff responds that she has established a prima facie case and that genuine issues of material fact surround ESU's alleged justification for the contract appointments, teaching duties and salary disparities. Plaintiff does not respond to ESU's motion for summary judgment on her claim that ESU violated Title VII by providing the volleyball team fewer resources than it provides the basketball and football teams, refusing to promote volleyball as well as football and basketball, and giving the volleyball team less assistance with game and event promotion. The Court therefore deems this part of plaintiff's Title VII claim abandoned, and sustains ESU's motion for summary judgment on this issue. *See Rowland v. Franklin Career Servs.,*

---

21. The volleyball team apparently did generate some revenue from ticket sales when ESU allowed it to sell tickets for post-season games. The record, however, does not indicate the amount of revenue, the number of games or the years in which this occurred.

22. ESU also argues that because plaintiff voluntarily withdrew her application, it is entitled to

summary judgment on plaintiff's claim that it violated Title VII by denying her a promotion to Assistant Athletic Director and Senior Women's Administrator. The pretrial order does not contain such a claim and ESU's motion for summary judgment is therefore overruled as moot on this issue.

*LLC*, 272 F.Supp.2d 1188, 1204 (D.Kan.2003) (citing *Merkel v. Leavenworth County Emergency Med. Servs.*, No. 98–2335–JWL, 2000 WL 127266, at *1 (D.Kan. Jan.4, 2000)).

## I. Equal Pay Act

Generally, the EPA prohibits wage discrimination between employees on the basis of sex "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions" at the same establishment. 29 U.S.C. § 206(d)(1).[23] The jobs need not be identical, but only substantially equal. 29 C.F.R. § 1620.13(a).

Plaintiff alleges that ESU pays her less than similarly situated male counterparts for equal work which requires similar effort, skill and responsibility, and which is performed under similar working conditions. *Pretrial Order* (Doc. # 105) filed April 12, 2004 at 16. As noted, ESU seeks summary judgment, arguing that plaintiff cannot make out a prima facie EPA claim because (1) she compares herself to three different coaches at ESU rather than a single male counterpart; (2) plaintiff cannot show that her job is substantially similar to the job of any other coach; (3) plaintiff and her comparators work under different working conditions; and (4) even if plaintiff makes out a prima facie case, ESU has two legitimate explanations for the salary disparities: merit and "factors other than sex" (market factors). *Defendant's Memorandum* at 35, 36, 46.

■ To establish a prima facie case under the EPA, plaintiff has the burden of proving that "(1) she was performing work which was substantially equal to that of the male em-

ployees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1364 (10th Cir. 1997) (quoting *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir.1993)).

If plaintiff establishes a prima facie case under the EPA, the burden shifts to ESU to establish that the pay disparity is the result of (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a factor other than sex. 29 U.S.C. § 206(d)(1). If ESU fails in this respect, plaintiff will prevail on her prima facie case. *Id.* Thus, under the EPA, "the onus is on the employer to establish that the pay differential was premised on a factor other than sex."[24] *Tidwell*, 989 F.2d at 409.

### A. *Comparators*

Under the EPA, the first step is to identify male and female comparators whose jobs may be analyzed to determine whether they are substantially equal. In selecting comparators, plaintiff must show that at least one specific employee of the opposite sex earned higher wages for a substantially equal job. *Pollis v. New Sch. for Soc. Research*, 913 F.Supp. 771, 784 (S.D.N.Y.1996). In this regard, plaintiff has selected Moe, the men's basketball coach, and Schneider, the women's basketball coach.[25] *Pretrial Order* (Doc. # 105) at 21–23.

ESU argues that plaintiff does not make out a prima facie case because she compares

**23.** Specifically, the EPA provides that:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor

other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
29 U.S.C. § 206(d)(1).

**24.** Title VII also prohibits discrimination because of sex with respect to compensation. 42 U.S.C. § 2000e–2(a)(1). Under Title VII, in contrast to the EPA, plaintiff must prove that ESU had discriminatory intent. *See Sprague*, 129 F.3d at 1364.

**25.** In the pretrial order, plaintiff also compares her head coaching position to the head football coach. In response to ESU's motion for sum-

herself to a "combination" of two different coaches at ESU rather than identifying a single male comparator. Specifically, ESU relies on *Houck v. Va. Polytechnic Inst.*, 10 F.3d 204, 206 (4th Cir.1993), for the proposition that "[a]ny comparison between male and female employees must be made on an individual basis-factor by factor with the male comparator-and the male comparator must be a particular individual employed by the defendant, not some hypothetical composite male." Apparently, ESU reads *Houck* in the narrowest sense, inferring that plaintiff can select only *one* comparator. Plaintiff, however, is not required to select only one person: she may identify one comparator or many, and ESU may also identify comparators. *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 and 918 (9th Cir.1983) (use of single comparator not prohibited; if more than one comparator, proper test for establishing prima facie case is whether plaintiff receives lower wages than average wage paid to all employees of opposite sex performing substantially equal work and similarly situated with respect to other factors such as seniority, that affect wage scale). Plaintiff's choice of specific comparators should be scrutinized to determine its usefulness. *See id.* (plaintiff's prima facie case flawed where plaintiff chose single employee for comparison because he was highest-paid, not because he was only comparable employee); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 122 (8th Cir.1981); *Weaver v. The Ohio State Univ.*, 71 F.Supp.2d 789, 799 (S.D.Ohio 1998).

ESU has not shown that plaintiff's prima facie case is fatally flawed because she invokes more than one comparator.[26] The Court therefore overrules ESU's motion for summary judgment on the basis that plaintiff identifies more than one comparator.

## B. *Whether Jobs Are Substantially Equal*

■ Once the parties identify comparators, plaintiff has the burden of proving that their jobs involve substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Whether two or more jobs require equal work in EPA terms is decided on a case-by-case basis. *Thomas v. Bd. of Educ., Unified Sch. Dist. No. 501, Topeka, Kan.*, No. 95–4218–SAC, 1997 WL 723437, at *8 (D.Kan. Oct.31, 1997) (citing *Brobst v. Columbus Servs. Intern.*, 761 F.2d 148, 156 (3rd Cir. 1985)). The relevant comparison is between the jobs and not the people holding them. *Id.* (citing *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 592 (11th Cir.1994)). "Only the skills and qualifications actually needed to perform the jobs are considered." *Id.* (citations and quotations omitted). The Court applies the equal work standard on the basis of the "substantial differences, such as those customarily associated with differences in wage levels" rather than on insubstantial, inconsequential or minor differences between the jobs. 29 C.F.R. § 1520.14(a).

The EPA's equal work requirement is not to be construed broadly. *Sprague*, 129 F.3d at 1364; *Nulf v. Int'l Paper Co.*, 656 F.2d 553, 560 (10th Cir.1981). "Like" or "comparable" work does not satisfy this standard, and it is not sufficient that "some" aspects of the jobs are the same. *Nulf*, 656 F.2d at 560. To prevail in an EPA action, the jobs must be "substantially equal" in terms of skill, effort, responsibility and working conditions. *Sprague*, 129 F.3d at 1364; *Nulf*, 656 F.2d at 560; *Ammons v. Zia Co.*, 448 F.2d 117, 120 (10th Cir.1971); 29 U.S.C. § 206(d)(1). Employers may not avoid liability under the EPA "by drawing overly fine distinctions in the tasks at issue." *Brennan v. South Davis Cmty. Hosp.*, 538 F.2d 859, 861 (10th Cir.1976).

ESU argues that plaintiff's job is not substantially equal to that of Moe or Schneider because (1) the NCAA imposes different recruiting restrictions on volleyball and basket-

---

mary judgment, however, plaintiff states that because of the size of the football program, she does not seek to use Weimers as a comparator. *Plaintiff's Response To Defendant's Motion For Summary Judgment* (Doc. # 101) filed March 26, 2004 at 65.

26. ESU does not specifically identify other comparators. It only cites the head coaches of track and field and cross-country, soccer, softball and baseball when addressing appointment terms.

ball coaches; (2) basketball is broadcast live on radio, while volleyball is not; (3) basketball coaches are required to provide pre-game and post-game radio shows while the volleyball coach is not; (4) in contrast with volleyball, basketball attracts large numbers of fans; (5) ESU sold tickets to basketball games but not volleyball games; and (6) basketball coaches have 12–month contracts while plaintiff has a ten-month contract.[27] Plaintiff claims that her job is substantially equal to the jobs of Moe and Schneider because all three of them (1) coach roughly the same number of players for the same number of games per season, (2) supervise the same number of assistant coaches, (3) have one of the top four operating budgets among ESU sports, and (4) are responsible for recruiting the same number of top notch players. Plaintiff also argues that ESU provides fewer resources and media opportunities to volleyball, and does not allow volleyball to charge admission or sell programs, and that it cannot use impermissible discrimination to establish that her job is not substantially equal to the jobs of Moe and Schneider.

Substantial equality is evaluated in terms of skill, effort and responsibility. *EEOC v. Cent. Kan. Med. Ctr.*, 705 F.2d 1270, 1272 (10th Cir.1983). This inquiry requires the

---

**27.** ESU relies on *Weaver* for the proposition that courts are reluctant to find an equality of work between coaches of different sports. *Defendant's Memorandum* at 36. In *Weaver*, the women's field hockey coach, who was female, sued Ohio State under the EPA. *Id.* at 791–92. Defendants sought summary judgment. The district court granted summary judgment, finding that plaintiff's job as field hockey coach was not substantially equal to the job of the men's ice hockey coach (which was held by a male). The record revealed that Ohio State expected coaches to perform at a certain level of expertise, the two sports had different seasons (men's ice hockey spanned five months with 35 to 38 games, and women's field hockey spanned two months with 19 to 21 games), the ice hockey team had 23 to 27 players and the field hockey team had 16 to 20 players, the ice hockey coach had a greater burden in public relations and ice hockey was one of the most popular sports and one of few to generate revenue. *Id.* at 800–01. The district court therefore found as a matter of law that plaintiff had failed to produce sufficient evidence that the positions were substantially equal. *Id.* at 801.

In *E.E.O.C. v. Madison Cmty. Unit Sch. Dist. No. 12*, 818 F.2d 577, 584 (7th Cir.1987), which the district court cited in *Weaver*, the EEOC brought suit against a school district, alleging that it violated the EPA by paying female coaches less than male coaches in its junior high and high schools. 818 F.2d at 578. After a bench trial, the district judge found that the male and female track coach positions were substantially equal, as were the male and female basketball coach positions, the female volleyball and male soccer coach positions and the female soccer and male baseball coach positions. On appeal, the Seventh Circuit Court of Appeals upheld the factual determination that the coaching positions for girls' and boys' tennis were substantially equal. *Id.* at 583. It vacated the factual determination that the coaching positions for boys' soccer and girls' volleyball, boys' soccer and girls' basketball, and boys' track and girls' basketball were substantially equal, finding that the district

court committed clear error. Specifically, the Seventh Circuit found that the district court equated coaching girls' basketball and girls' volleyball to coaching boys' soccer without regard for the fact that the school district treated coaching different sports as different coaching jobs irrespective of the sex of the coach or the team. The Seventh Circuit noted that since wages varied by sport rather than by job (*i.e.* "head coach" or "assistant coach"), the district court had made an arbitrary determination when it assumed that if the coach of girls' volleyball or basketball had been male, he would have been paid as much as the boys' soccer coach; that the comparisons which plaintiff had suggested were arbitrary; and that the school district had no way of knowing that a court would think basketball and soccer or volleyball and soccer a closer pair than track and soccer. *Id.* at 584.

In *Deli v. Univ. of Minn.*, 863 F.Supp. 958 (D.Minn.1994), which the district court also cited in *Weaver*, a former head women's gymnastics coach sued the University of Minnesota, alleging that it paid her less than head coaches of several men's athletic teams, in violation of the EPA. 863 F.Supp. at 959. The district court granted summary judgment in favor of the University, holding that although the EPA prohibits discrimination based on the gender of the claimant, it does not reach compensation differentials based on the gender of the athletes which the claimant coaches. *Id.* at 960. Further, it noted that even if plaintiff had alleged discrimination based on her own gender, plaintiff did not establish that her position was substantially equal to that of the men's football, hockey and basketball coaches. Specifically, it noted the University evidence that the three coaches of male teams supervised more employees than plaintiff and had more responsibility for public and media relations than plaintiff. Additionally, the male teams enjoyed significantly greater spectator attendance and generated more revenue. *Id.* at 961.

These three fact-specific cases do not establish a judicial "reluctance" to find equality of work between coaches of different sports.

Court to make a practical judgment based on all facts and circumstances of the case. *Id.* The inquiry is a factual determination, and summary judgment will therefore often be inappropriate. *Thomas,* 1997 WL 723437, at *9 (citing *Fallon v. Ill.,* 882 F.2d 1206, 1208 (7th Cir.1989)).

### 1. *Substantially Equal Skill*

The skills required by each identified coach are examined considering such factors as experience, training, education, and ability. *Cent. Kan. Med. Ctr.,* 705 F.2d at 1272 (citing *E.E.O.C. v. Universal Underwriters Ins. Co.,* 653 F.2d 1243, 1245 (8th Cir.1981)); *see also* 29 C.F.R. § 1620.15(a). Plaintiff has more education and coaching experience than Moe and Schneider. The women's basketball team has enjoyed great success under Schneider, which may suggest superior coaching ability, but the record is largely silent as to the experience, training, education and ability required to be head coach for men's basketball, women's basketball and volleyball at ESU. ESU provides no evidence regarding specific requirements for coaching positions or whether prior coaching experience or other specific skills are necessary. Accordingly, it has not established as a matter of law that plaintiff's position requires different skills than ESU requires of basketball coaches.

### 2. *Substantially Equal Effort*

To determine whether coaching jobs require equal effort, the Court looks at the actual requirements of the jobs being compared. 29 C.F.R. § 1620.16(a). Effort required by each coach is examined considering the physical or mental exertion needed for the performance of the job. *Cent. Kan. Med. Ctr.,* 705 F.2d at 1272 (citing *Universal Underwriters Ins. Co.,* 653 F.2d at 1245); *see also* 29 C.F.R. § 1620.16(a). If the difference in effort is only in the kind of effort required, not the amount or degree, a wage differential is not justified. *Id.*

ESU apparently argues that coaching basketball requires greater effort than coaching volleyball because (1) the NCAA has different recruiting rules for basketball and volleyball; (2) basketball is broadcast on radio; (3) basketball coaches are required to provide pre-game and post-game radio shows; (4) basketball attracts larger numbers of fans; (5) ESU sells tickets to basketball games; and (6) basketball coaches have 12–month contracts.

ESU provides no evidence that differences in NCAA recruiting rules require different levels of recruiting effort, or that coaching a broadcast sport requires more effort than coaching a sport that is not broadcast. All ESU coaches are responsible for "public relations" and ESU provides no evidence that coaches who participate in radio programs must exert substantially more effort than coaches who do not. Nothing in the record reveals how much physical or mental effort is required to perform public relations responsibilities. Similarly, the record contains no evidence that ticket sales, or larger numbers of fans, require basketball coaches to exert substantially more effort than coaches with no ticket sales and fewer fans. Finally, while ESU argues that 12–month appointments are necessary to accommodate summer recruiting in basketball, plaintiff cites evidence that ESU requires her to recruit during the summer and that she is the only Division II volleyball coach in Kansas with a ten-month appointment—a fact which suggests that volleyball coaching requires year-round commitment. In other words, viewing the evidence in the light most favorable to plaintiff, a jury could find that even though plaintiff has a ten-month appointment, ESU requires 12 months of effort. Genuine issues of material fact surround the question whether head basketball and volleyball coach positions require substantially equal effort.

### 3. *Substantially Equal Responsibility*

Responsibility is concerned with the degree of accountability required in the performance of the job with emphasis on the importance of the job obligation. *Cent. Kan. Med. Ctr.,* 705 F.2d at 1272 (citing *Universal Underwriters Ins. Co.,* 653 F.2d at 1245); *see also* 29 C.F.R. § 1620.17(a).

As noted, ESU argues that plaintiff's job responsibilities are not substantially equal to those of Moe or Schneider because basketball has different recruiting rules, basketball

games are broadcast, basketball coaches provide radio shows, more fans attend basketball games, ESU sells tickets to basketball games and basketball coaches have 12–month contracts. ESU provides no evidence, however, that these differences impose more responsibility on Moe and Schneider than on plaintiff. The ESU staff manual states that all coaching positions have the same major areas of responsibility. Plaintiff, Moe and Schneider each supervise one full-time assistant coach and one graduate assistant. They coach approximately the same number of athletes in the same number of games. They manage budgets, organize fundraising, engage in recruiting and public relations and are responsible for day-to-day program operations such as supervising equipment and arranging travel. Further, while Moe and Schneider have 12–month appointments, the record suggests that plaintiff also has 12 months of responsibility. In other words, the record reveals genuine issues of material fact whether plaintiff's responsibilities are substantially different from those of Moe and Schneider.

### 4. Working Conditions

The EPA adopts a flexible standard of similarity as a basis for testing this requirement. In determining whether the requirement is met, a practical judgment is required in light of whether the differences in working conditions are the kind customarily taken into consideration in setting wage levels. 29 C.F.R. § 1620.18(a). "Generally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions." ESU argues that plaintiff, Moe and Schneider work under substantially different working conditions because of game schedules (early fall for volleyball versus late fall and winter for basketball), numbers of fans ("dozens" [sic] for volleyball versus "thousands" [sic] for basketball), live broadcasts (only away volleyball games are broadcast, while all basketball games are broadcast), and pressure to perform ("few pressures placed on the plaintiff ... to perform in front of the small live crowd," while every basketball

coaching move is scrutinized by every fan, radio listener, play-by-play announcer and color commentary).

The term "working conditions," as used in the EPA, is a term of art which refers to physical surroundings and hazards encountered on the job. Corning Glass, 417 U.S. at 202, 94 S.Ct. 2223 (The term " 'similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.' 'Surroundings' measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency. 'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause."); see 29 CFR § 1620.18(a). ESU provides no evidence that plaintiff, Moe and Schneider are exposed to different physical surroundings or hazards in performing their duties, or any other evidence which indicates that the differences which it lists impose different working conditions on volleyball and basketball coaches.

### C. Whether ESU Can Establish That An Exception Applies

As noted, if plaintiff establishes a prima facie case under the EPA, the burden shifts to ESU to prove an affirmative defense— that the pay disparity is the result of (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a factor other than sex. See Sprague, 129 F.3d at 1364 (citation omitted); 29 U.S.C. § 206(d)(1). ESU maintains that it is entitled to summary judgment because any wage disparity is based on merit and factors other than sex. ESU's burden at this stage is heavy. Klindt v. Honeywell Intern. Inc., 303 F.Supp.2d 1206, 1219 (D.Kan.2004) (quoting Stanziale v. Jargowsky, 200 F.3d 101, 108 (3d Cir.2000)).

ESU's burden with respect to plaintiff's EPA claim differs significantly from its burden with respect to plaintiff's Title VII claim.[28] Id. at 1222. Because it bears the burden of proof at trial on its affirmative

---

28. Under Title VII, a defendant must articulate a legitimate, non-discriminatory reason for the pay disparity. See Sprague, 129 F.3d at 1363 (citation and quotations omitted). The burden is light and defendant need only proffer non-gender based reasons, not prove them. Id.

defense, ESU may only prevail at the summary judgment stage if it proves its affirmative defense "so clearly that no rational jury could find to the contrary." *Id.* at 1219 (quoting *Stanziale,* 200 F.3d at 108); *Meek v. Swift Transp. Co., Inc.,* No.99–2233–JWL, 2000 WL 382039, at *5 (D.Kan. Apr.11, 2000) (quoting *Stanziale,* 200 F.3d at 108). "Moreover, in proving its affirmative defense, [ESU] must submit evidence from which a reasonable jury could conclude not merely that [ESU's] proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity." *Id.* (quotations and citation omitted) (emphasis in original).

As noted, ESU argues that it uses a merit system to determine salaries and raises of head coaches. It cites testimony from President Shallenkamp that ESU uses a merit system to set salaries. Weiser, however, claims that he is not aware of a merit system with respect to head coaches. The record reveals genuine issues of material fact whether ESU uses a merit system to set and increase salaries and if so, precisely how the alleged system operates.

ESU also argues that it is entitled to summary judgment because it uses factors other than sex to determine salaries and raises for head coaches. Specifically, ESU argues that (1) it adjusted Schneider's salary based on free market forces to keep him as head women's basketball coach; (2) it set Moe's salary based on free market forces; and (3) the market salary for plaintiff is substantially less than that for Schneider and Moe;[29] and (4) plaintiff earns a salary higher than linear regression analysis would predict from the salaries of other MIAA volleyball coaches.

"Factors other than sex" is a broad principle which explicitly states that a differential based on factors other than sex does not violate the EPA. *County of Wash. v. Gunther,* 452 U.S. 161, 171 n. 11, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Market value is a "factor other than sex" under 29 U.S.C. § 206(d)(1)(iv). *Varley v. Superior Chevrolet Auto. Co.,* No. 96–2119–EEO, 1997 WL 161942, at *11 (D.Kan. Mar.21, 1997) (citing *E.E.O.C. v. Aetna Ins. Co.,* 616 F.2d 719, 726 (4th Cir.1980); *Horner v. Mary Inst.,* 613 F.2d 706, 714 (8th Cir.1980)); *see also Angove v. Williams–Sonoma, Inc.,* 70 Fed. Appx. 500, 508 (10th Cir.2003) (EPA only precludes employer from relying solely on prior salary to justify pay disparity); *Stanely v. Univ. of S. Cal.,* 13 F.3d 1313, 1322 (9th Cir.1994) (unequal wages which reflect market conditions of supply and demand not prohibited); *Weaver,* 71 F.Supp.2d at 801 (same). Because the relevant facts are peculiarly within its knowledge, ESU must show the necessary facts behind this exception. *Morgado v. Birmingham–Jefferson County Civ. Defense Corps.,* 706 F.2d 1184, 1189 (11th Cir.1983).

As noted, plaintiff, Schneider and Moe received the following salaries:

| Coach | FY 2000 | FY 2001 | FY 2002 | FY 2003 |
|---|---|---|---|---|
| Moe | | $12,463 [30] | $60,008 | $60,008 |
| Schneider | $42,042 | $59,540 | $60,880 | $61,327 |
| Plaintiff | | $45,144 | $46,160.29 | $46,499 |

**29.** ESU also argues that it funds sports to be competitive in the MIAA and that "[a]llowing the free market to establish the salaries of [ESU] coaches is a 'factor other than sex' which allows [ESU] to be competitive with its MIAA opponents." *Defendant's Memorandum* at 51. Basically, ESU claims that it compares the success of women's basketball, men's basketball and volleyball. ESU does not explain how salaries factor into this comparison, however, and it denies that salaries are calculated on the basis of merit.

ESU contends that it is competitive in women's basketball with the fourth largest budget in the MIAA and competitive in men's basketball with the smallest budget in the MIAA. Further, it states that ESU volleyball has the fourth highest budget in the MIAA and claims that plaintiff's salary reflects the low priority given volleyball by other MIAA institutions. Further, ESU argues that it is able to fill the head volleyball coach position at a lower salary—whether the coach is male or female—because the basketball teams have stronger competition and a higher priority in the league than volleyball. None of these arguments, however, explain the specific wages which ESU pays to plaintiff ($46,499), Moe ($60,008) or Schneider ($61,327). ESU does not provide evidence from which a reasonable jury would necessarily conclude that its alleged policy of funding sports to be competitive with the MIAA explains the wage disparity between plaintiff, Moe and Schneider.

**30.** Moe received this salary for 11 weeks of work in FY 2001.

Plaintiff earns approximately $13,000 less than Moe and $15,000 less than Schneider. To prove its affirmative defense on summary judgment, ESU must submit conclusive evidence that its proffered reasons *do in fact* explain the disparity. *Meek,* 2000 WL 382039, at *5 (citation omitted).

ESU argues that it increased Schneider's salary from $42,042 to $59,540 to keep him in FY 2001 after Missouri offered him an associate coach position at a higher salary. ESU offers evidence that it adjusted Schneider's salary based on free market forces, but the record is not clear whether it increased his salary before or after he decided to stay, and ESU provides no evidence that the increase was necessary to keep him. Indeed, plaintiff cites evidence that Schneider stayed at ESU because of his "kids," thereby suggesting that market forces were not even a factor in Schneider's decision. Further, ESU cites no evidence regarding any relevant "market"— whether it be for basketball coaches, head coaches in the MIAA, associate coaches in the Big 12 or some other market. ESU's evidence does not conclusively explain the disparity between Schneider's salary and plaintiff's.

ESU hired Moe as head men's basketball coach in FY 2001 and argues that based on free market forces, it set his salary at $60,008. Specifically, ESU argues that it set Moe's salary based on his experience and the relative importance of ESU men's basketball. ESU offers evidence regarding Moe's coaching experience, and evidence that men's basketball generates a significant amount of revenue. It provides evidence that Moe earned a $61,000 base salary as assistant coach at Colorado, and a comparable salary may have been necessary to lure him to ESU. ESU, however, cites no evidence regarding what the relevant market is, or what Moe's value is in that market. Indeed, ESU's evidence may explain the compensation parity between Moe and Schneider, as head coaches for men's and women's basketball, but it does not conclusively explain the disparity between Moe and plaintiff. Moe's salary has no apparent correlation to anything except his salary at Colorado and Schneider's salary at ESU. Moe's years of experience, the revenues of the men's basketball program, the

"relative importance" of men's basketball at ESU, and the need to fund a basketball program which is competitive with in the MIAA are not shown to be relevant factors, just as plaintiff's salary has no demonstrated correlation to her years of experience, volleyball revenues or the "relative importance" of volleyball at ESU.

ESU argues that plaintiff's market value is substantially less than that of Moe and Schneider, and that it pays her what she is worth in that market. ESU offers evidence that (1) plaintiff has been at ESU since 1988; (2) she is the second or third highest paid volleyball coach in the MIAA; (3) despite early success in the NAIA, she has never won an MIAA championship or been invited to the NCAA Division II championship tournament; (4) she has never coached in professional or Olympic ranks; and (5) no other universities have attempted to lure her away. Again, however, ESU provides no evidence regarding the relevant market or plaintiff's market value in it. Plaintiff notes that she has the same level of experience as Peggy Martin, the volleyball coach at Central Missouri State University, and claims that based on MIAA market forces, she should earn what Martin earns. Plaintiff and Martin indeed have similar coaching experience, and presumably similar job responsibility. Their coaching records are different and because her teams have been more successful, a reasonable jury might find that Martin can command a higher salary in the MIAA market— if that is the relevant market. ESU provides no evidence regarding how it set plaintiff's salary in 1988, or how it has determined her raises. It claims that it determined plaintiff's raises based on merit, but Weiser—who is responsible for head coach raises—testified that ESU has no type of merit system for head coaches. Viewed in the light most favorable to plaintiff, the record reveals genuine issues of fact whether the salary disparity between plaintiff, Moe and Schneider results from a factor other than sex.

ESU argues that according to Faurot, plaintiff's salary is higher than linear regression analysis would predict from the salaries of other MIAA coaches, and that in view of prevailing market forces, plaintiff is over-

paid—not underpaid. As previously noted, however, the Court has reserved ruling whether Faurot's opinion is sufficiently reliable to survive scrutiny under *Daubert.* His opinion does not satisfy ESU's burden of providing evidence which proves its affirmative defense—that it uses factors other than sex to determine salaries and raises for head coaches—"so clearly that no rational jury could find to the contrary." *Meek,* 2000 WL 382039, at *5 (citation omitted). The Court therefore overrules ESU's motion for summary judgment on this issue.

## II. Title VII

Plaintiff contends that ESU violated Title VII by subjecting her to different terms, conditions and privileges of employment than similarly situated males. *Pretrial Order* (Doc. # 105) at 12. Specifically, plaintiff alleges that ESU discriminated against her by (1) providing her a ten-month appointment; (2) requiring her to teach; and (3) paying her less than Moe and Schneider for equal work which requires substantially similar skill, effort and responsibility.

ESU seeks summary judgment on plaintiff's Title VII claims, arguing that (1) plaintiff cannot establish a prima facie case of gender discrimination; and (2) even if plaintiff establishes a prima facie case, it has legitimate nondiscriminatory reasons for setting contract appointment periods, assigning teaching responsibilities, and setting and raising coaches' salaries.

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Disparate treatment analysis is applied to claims alleging "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To prevail on her disparate treatment claim under Title VII, plaintiff must show that the discrimination complained of was intentional.

*See Shorter v. ICG Holdings, Inc.,* 188 F.3d 1204, 1207 (10th Cir.1999). In a Title VII disparate treatment case, plaintiff has the initial burden to make a prima facie showing of gender discrimination by ESU. *See Nulf,* 656 F.2d at 557 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Plaintiff satisfies this burden by presenting a scenario that on its face suggests that ESU more likely than not discriminated against her. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden of establishing a prima facie case of disparate treatment is not onerous. *Id.* If plaintiff establishes a prima facie case, the burden shifts to ESU to articulate a "legitimate, nondiscriminatory reason" for the questioned action. *See Nulf,* 656 F.2d at 558. If ESU meets this burden, plaintiff must show that its stated reason is actually a pretext for prohibited discrimination. *See id.*

### A. *Appointment Term*

■ As stated above, plaintiff alleges that ESU has violated Title VII by providing her a ten-month appointment and providing 12–month appointments to Moe and Schneider. ESU seeks summary judgment on this part of plaintiff's Title VII claim, arguing that it did not treat her less favorably because it gave ten-month appointments to other coaches, both male and female.

To make a prima facie showing that ESU treated her less favorably than her male counterparts by giving her a ten-month appointment, plaintiff must show that "(1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination." *Ammon v. Baron Auto. Group,* 270 F.Supp.2d 1293, 1310 (D.Kan. 2003) (citing *Hysten v. Burlington N. & Santa Fe Ry. Co.,* 296 F.3d 1177, 1181 (10th Cir.2002)).

As noted, four male coaches—Harris (track and field and cross country), Siegele (tennis), Huntoon (soccer) and Fornelli (baseball), and two female coaches—plaintiff and Gemeinhardt (softball)—have ten-month appointments. Three male former coaches

(Embery, baseball), 1997 to 2003; Milton, tennis, 1997 to 1999; and Phillips, tennis, 1999 to 2000, and one female former coach (Kord, softball, 1997 to 2002) also had ten-month appointments. ESU provides 12–month appointments to three male head coaches—Weiser (football), Moe (men's basketball) and Schneider (women's basketball)—and no women. One former female coach—Stein (women's basketball) had a 12–month appointment. Plaintiff alleges that she is similarly situated to Moe and Schneider, however, because they all coach "top-funded" sports and have substantially the same job responsibilities.

The record reveals the appointment terms for the above coaches, and information about the jobs of volleyball, football and basketball coaches. Aside from the general job description, the record does not reveal any information about the duties of other coaches. Thus, genuine issues of material fact exist whether plaintiff is similarly situated to Moe and Schneider or whether she is more similarly situated to those coaches with ten-month appointments. ESU is not entitled to summary judgment on the ground that certain male coaches have ten-month appointments.

If plaintiff establishes a prima facie case, the burden shifts to ESU to articulate a legitimate, non-discriminatory reason for providing 12–month appointments to Moe and Schneider while giving plaintiff a ten-month appointment. *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1008 (10th Cir.2001) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). ESU argues that it provides 12–month appointments to Moe and Schneider because NCAA recruiting rules for basketball require 12–month appointments, while other sports have more relaxed rules which allow ten-month appointments. ESU has satisfied its "exceedingly light" burden to provide nondiscriminatory reasons for its actions. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.1999). Thus, plaintiff must present evidence that the ESU reasons are pretextual (*i.e.* unworthy of be-

lief) or introduce evidence of a discriminatory motive. *See Danville v. Reg'l Lab. Corp.*, 292 F.3d 1246, 1250 (10th Cir.2002) (citing *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir.2000)).

Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997)).

Plaintiff argues that genuine issues of material fact surround ESU's stated reason for giving her a ten-month appointment. Specifically, she cites evidence that (1) she must recruit in the summer, (2) she is the only Division II volleyball coach in Kansas who does not have a 12–month contract; and (3) the Grievance Committee recommended that ESU offer 12–month appointments to all coaches who must recruit during the summer. Plaintiff also notes that ESU cites no evidence that Moe and Schneider actually recruit in the summer months.

Although ESU presents evidence that Moe and Schneider have more "restrictive" recruiting rules, the record contains no evidence regarding their summer recruiting responsibilities or how the NCAA rules impact the need to recruit in the summer.[31] Furthermore, ESU does not dispute plaintiff's evidence that she is required to recruit during the summer or that the Grievance Committee recommended that ESU offer 12–month appointments to all coaches who must recruit during the summer. The record contains no evidence regarding whether other ESU coaches with ten-month appointments have summer recruiting responsibilities. Genuine issues of material fact exist regarding ESU's stated reason for giving plaintiff a ten-month appointment. The Court there-

---

**31.** By referring to more "restrictive" recruiting rules, ESU apparently means that basketball has more "dead periods" when coaches cannot recruit and that basketball coaches are therefore "restricted" from recruiting during those peri-

ods. Ironically, this argument seems to suggest that volleyball coaches have more time-consuming and protracted recruiting responsibilities than basketball coaches do.

fore overrules ESU's motion for summary judgment on this issue.

### B. *Teaching Requirement*

██ Plaintiff alleges that ESU discriminated against her based on sex by requiring her to teach but not requiring Moe and Schneider to do so. ESU seeks summary judgment, arguing that plaintiff cannot establish that it treated her less favorably than male coaches by assigning her teaching responsibilities and, even if she did, ESU had a legitimate non-discriminatory reason for doing so.

ESU specifically notes that two other coaches have teaching responsibilities: Harris, the male head coach of men's and women's track and field and cross country, and Gemeinhardt, the female women's softball coach, who assumed plaintiff's teaching load for the spring semester of 2004. Embery, the male former baseball coach, and Phillips, the male former tennis coach, also taught courses. Plaintiff alleges that she is similarly situated to Moe and Schneider, however, rather than to Harris, Gemeinhardt, Embery and Phillips, because she, Moe and Schneider coach "top-funded" sports and have substantially the same job responsibilities. For reasons stated above, genuine issues of material fact exist whether plaintiff is similarly situated to Moe and Schneider, and whether ESU discriminated against plaintiff based on her gender by requiring her to teach courses.

If plaintiff establishes a prima facie case, the burden shifts to ESU to articulate a legitimate, non-discriminatory reason for assigning plaintiff teaching responsibilities. *English*, 248 F.3d at 1008. ESU claims that it assigns teaching duties based on business/education reasons. Specifically, it states that some coaches must teach courses related to the sports they coach and that because Slaymaker, a former basketball coach, teaches fundamentals of basketball, Moe and Schneider are not needed to teach that course. ESU also notes that it relieved plaintiff of responsibility for teaching softball, so plaintiff now teaches only one course, in her sport.

This evidence may explain why plaintiff now teaches volleyball, but it does not explain why ESU made plaintiff teach softball until she filed this lawsuit, or why ESU "bought out" teaching contracts for basketball coaches and created a position in HPE & R to take over the hours which basketball coaches were not teaching. Further, the record reveals that ESU does not pay plaintiff extra for her teaching.

Genuine issues of material fact exist regarding ESU's reasons for assigning plaintiff teaching duties. The Court therefore overrules ESU's motion for summary judgment on this issue.

### C. *Equal Pay*

██ As noted above, plaintiff alleges that ESU violated Title VII by paying her less than similarly situated male counterparts—Moe and Schneider—for equal work which requires substantially similar skill, effort and responsibility. ESU seeks summary judgment on this claim, arguing that plaintiff cannot establish a prima facie case because her job is not similar to that of Moe and Schneider and even if she is similarly situated, it has a legitimate, non-discriminatory reason for the pay disparity.

To establish a prima facie case of wage discrimination under Title VII, plaintiff must show that she is a member of a protected class and occupied a job similar to that of higher paid employees. *Sprague*, 129 F.3d at 1362–63. Plaintiff is not required to show that she was performing work substantially equal to that of higher paid employees, as required for an EPA claim. *Sprague*, 129 F.3d at 1362–63 (citing *Gunther*, 452 U.S. at 168–71, 101 S.Ct. 2242); *see also Klindt*, 303 F.Supp.2d at 1221. If plaintiff establishes a prima facie case, ESU must articulate a legitimate, non-discriminatory reason for paying plaintiff less. ESU's burden is exceedingly light. ESU need only proffer non-gender based reasons; it need not prove them. *Sprague*, 129 F.3d at 1363. If ESU offers such justification, plaintiff must show that ESU, regardless of its proffered reason, discriminated against her. *Id.* That is, plaintiff must show that "a discriminatory reason more likely than not motivated [ESU] to pay her less." *Id.* (quoting *Meeks v. Computer*

*Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir. 1994)).

As noted above, plaintiff presents evidence sufficient to establish a genuine issue of material fact whether she is similarly situated to Moe and Schneider. ESU does not challenge any other facet of plaintiff's prima facie case, and the Court deems it to be established for purposes of this analysis.

The burden therefore shifts to ESU to articulate a legitimate, non-discriminatory reason for paying plaintiff less. ESU contends that it sets and adjusts the salaries of plaintiff, Schneider and Moe according to the free market. Specifically, ESU claims that it adjusted Schneider's salary to keep him as head women's basketball coach and that it set Moe's salary to recruit him from the University of Colorado. ESU provides no explanation regarding how it set plaintiff's salary in 1988. It claims that it determined her raises based on merit. As noted, genuine issues of material fact exist whether ESU even has a merit system. ESU, however, need only proffer non-gender based reasons; it need not prove them. *Sprague,* 129 F.3d at 1363. It has met this burden, and the burden therefore falls on plaintiff to demonstrate a triable issue of fact through evidence that could cause a reasonable factfinder to disbelieve ESU's proffered reasons or to believe that gender discrimination was more likely than not a motivating factor in its salary decisions.[32] Plaintiff argues that the market value of her job is equal to that of Moe and Schneider, and that she has more experience, so "[t]here is no other valid explanation for such a huge disparity in salaries other than illegal discrimination."

Indeed, as noted, the record reveals that plaintiff, Moe and Schneider have generally the same job responsibilities. The record contains no evidence which demonstrates the market value of volleyball and basketball coaches in the MIAA, Division II of the NCAA or elsewhere. Giving plaintiff the benefit of all favorable inferences, a jury might reasonably disbelieve ESU's explanation and conclude that ESU discriminated against plaintiff on the basis of sex by paying her less than Schneider and Moe. The Court therefore overrules ESU's motion for summary judgment as to plaintiff's Title VII equal pay claim.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment* (Doc. # 86) filed March 5, 2004 be and hereby is **OVERRULED in part.** ESU's motion is **SUSTAINED** as to plaintiff's claim that ESU discriminated against her based on sex by providing the volleyball team fewer resources than it provides to the basketball and football teams, in violation of Title VII. ESU's motion is **OVERRULED as MOOT** as to plaintiff's claim that it violated Title VII by denying her a promotion to Assistant Athletic Director and Senior Women's Administrator. ESU's motion is otherwise **OVERRULED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion In Limine To Strike Defendant's Expert Lamar Daniels' [sic] Report And Testimony And Suggestions In Support* (Doc. # 99) filed March 22, 2004 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Plaintiff's Motion In Limine To Strike Defendant's Expert David Faurot's Report And Testimony And Memorandum In Support* (Doc. # 102) filed April 5, 2004 be and hereby is **OVERRULED.**

---

**32.** Plaintiff's EPA claim, on the other hand, does not require a showing of intentional discrimination. *See Tidwell,* 989 F.2d 406 (affirming district court entry of judgment on Title VII claim where plaintiff failed to show intentional discrimination even though jury returned verdict for plaintiff on EPA claim); *accord Sprague,* 129 F.3d at 1364.