Jennifer (Starr) **MICKELSON,** Plaintiff,

v.

**NEW YORK LIFE INSURANCE CO., Defendant.**

**No. CIV.A. 03–2294CM.**

United States District Court, D. Kansas.

Jan. 24, 2005.

Kristi L. Kingston, Bratcher Gockel & Kingston, L.C., Martin M. Meyers, The Meyers Law Firm, LC, Mark A. Buchanan, Sanders, Simpson & Fletcher, L.C., Kansas City, MO, for Plaintiff.

Sherry Hall Messner, Elaine D. Koch, Heather S. Esau–Zerger, Jeremiah J. Morgan, Bryan Cave LLP, Mark A. Jess, Employee Rights Law Firm, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

NEWMAN, District Judge.

Plaintiff brought this action against defendant on May 22, 2003, claiming that defendant discriminated against her in violation of the Equal Pay Act provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d)(EPA), and Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* (Title VII). Plaintiff also claims that defendant retaliated against her in violation of Title VII after she made complaints of unequal pay. This matter comes before the court on defendant New York Life Insurance Company's Motion for Summary Judgment (Doc. 49).

## I. Facts

As a preliminary matter, the court notes that plaintiff submitted affidavits of two former employees of defendant, Julie Hammer–Miller and Rhonda Kunz, in support of her opposition to the summary judgment motion. The affidavits set forth Hammer–Miller's and Kunz's feelings about their own personal treatment by defendant, as well as allegations of sex and salary discrimination by defendant. The court disregards these affidavits to the extent that they contain conclusory allegations that are not supported by the record. *Nichols v. Hurley,* 921 F.2d 1101, 1113 (10th Cir.1990) (noting that "conclusory allegations without specific supporting facts have no probative value") (quoting *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985)).

The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Federal Rule of Civil Procedure 56.

### A. Defendant's Organization and the Marketing Services Consultant Position

Defendant sells life insurance products. Defendant markets its products and services to independent brokers throughout the United States through the use of field directors. Field directors are defendant's sales force responsible for selling defendant's products. Defendant hired Louis Gardner in 2002, and Gardner has been the head of the internal sales support team from the end of August 2003 to present.

Defendant's marketing efforts focus on three categories: M financial group, "Bisys," and Brokerage General Agencies (BGA). The internal sales support team has 10 field directors: five are responsible for BGA, two for Bisys, and three for M financial group.

Traditionally, defendant has sold to basic life insurance markets. In 2002, defendant's management wanted to move into markets offering more variable life insurance products. In order to market such products, defendant must utilize broker-dealers. Defendant contends that, in order to sell these variable products, a salesperson must have either a series 6 or series 7 securities license. Series 6 and series 7 securities licenses allow a person to sell various products in the life insurance market. In order to obtain a series 7 license instead of a series 6, one must pass

a more rigorous test. Plaintiff contends that a series 7 license is required to become a stockbroker, but that a series 7 license is unnecessary to sell variable insurance products.

Marketing Services Consultants (MSC) are internal sales support people at defendant. Their role is to support field directors and to work with defendant's producing groups to ascertain information they might need, to run illustrations [1] and to work closely with the field directors to generate business for defendant. Defendant requires that its MSCs have at least a series 6 license. In 2002, a total of six MSCs worked in defendant's Leawood, Kansas office.

During most of plaintiff's employment, Tracie Billings, a female, was classified as a MSC, but also acted as the supervisor of the internal sales support unit. Billings' starting salary was $70,000.[2]

For purposes of setting salaries, among other reasons, employees at defendant are assigned a grade level. John Begley is defendant's human resources director at the Leawood, Kansas office. Begley testified that defendant did not have written guidelines for setting salaries within a grade range. James Vavra has worked at defendant since May 1997, and is currently vice-president of operations. During his employment with defendant, Vavra has not received any training on setting salaries.

Defendant contends that MSCs are universally assigned grade level 13, and senior MSCs are universally assigned grade level 14. Once a candidate is assigned a grade level, the candidate's salary is set within the range provided for that grade level. Plaintiff does not dispute that experience could be a relevant factor for defendant to consider when determining a person's starting salary.

## B. Plaintiff's Employment As A Marketing Services Consultant

Plaintiff is a female and was hired in September 2000 as a MSC in defendant's Leawood, Kansas office. In plaintiff's personnel file, the factors listed for her hiring were her experience, abilities and education. Plaintiff has her Juris Doctorate from the University of Nebraska.[3]

Prior to working for defendant, plaintiff worked part-time during college (July 1993 to December 1995 and August 1996 to June 1997) as a data prep clerk at Lincoln Benefit Life (LBL). Between 1997 and 2000, while plaintiff was in law school, her part-time work with LBL consisted of various projects such as updating databases and helping with special mailings. The special mailings were purely clerical work. Plaintiff contends that her position with LBL was full-time during the summers while she was in college and that she held a marketing job very similar to defen-

---

1. The term "illustration" refers to a written proposal for sale of a life insurance policy.

2. It is undisputed that Billings was the most highly paid MSC in defendant's Leawood office. Plaintiff contends, however, that Billings' position was different from plaintiff's because Billings was the supervisor of the sales support unit, not strictly a MSC.

3. Defendant's Leawood office does not utilize in-house attorneys as part of its sales team. If legal expertise is required, defendant hires this work out.

Defendant contends that plaintiff did not use her law degree as a MSC and that plaintiff's law degree was neither helpful nor useful in performing the functions of her job as a MSC. Begley stated during his deposition that he could not say whether an MBA or a law degree is more relevant to the MSC position. Plaintiff testified that she worked with attorneys on a daily basis, and her law degree was helpful in working with producers who had law degrees. Both Susan (Nelson) Hairgrove, another MSC, and Billings testified that having a law degree added credibility when dealing with clients.

dant's MSC position. Plaintiff further contends that her experience at LBL qualifies as several years experience in the insurance industry.

Plaintiff graduated from college in 1996 and from law school in 2000. Plaintiff was unemployed between May 2000 and September 2000, just prior to being hired by defendant, except for one week that she worked as a receptionist making ten dollars per hour. When defendant hired plaintiff, she had very little salary history and was making about $30,000 more than she had made in an equivalent full-time basis in any previous job. Plaintiff did not have series 6, 7 or 63 licenses when she began her employment with defendant. Plaintiff's industry-related education consisted only of tests she has taken while at defendant.

Plaintiff was hired at grade level 13, with a starting salary of $50,000. Vavra made the decision to offer plaintiff $50,000. Plaintiff received the job and salary offer in a letter signed by Begley. Begley does not have any notes about why plaintiff was offered that amount, and he is not aware of any documents created in this time frame that explain what factors were used in setting plaintiff's salary. Defendant does not require such documentation.

Defendant contends that plaintiff's starting salary was negotiable. Plaintiff contends that Begley did not conduct any salary negotiations with her, and that Vavra didn't think anyone told plaintiff that her salary was negotiable. Plaintiff also contends that when she interviewed with Begley and was hired, Begley told her that she would receive a raise and a bonus of approximately five percent in March following her hire. Defendant denies that

Begley made any such statements. Plaintiff knows a MSC's performance rating can affect the bonus he or she receives. Plaintiff does not know whether performance can affect a MSC's raise.

Defendant was pleased with plaintiff's performance from the start and was happy with the way she was developing in her unit. However, in plaintiff's January 2001 performance evaluation, defendant rated her at a "4," which is below average. Plaintiff's supervisors told her this meant she would not receive a raise that year. Plaintiff admits that she received a "4" rating because she had been working at defendant a very short time and defendant could not give her a higher rating.

In a July 19, 2001 e-mail message to Vavra requesting a pay raise, plaintiff stated that she had a high salary and that defendant had been good to her. Plaintiff notes that she sent this e-mail six months before she learned that both Mark Shelton and Kevin Harriman, other MSCs, had been hired at starting salaries of $60,000.

By the time of her 2002 performance review, plaintiff had obtained her series 6 license and passed the Nebraska Bar Examination. By September 23, 2002, plaintiff's salary had increased to $53,400.

## C. Other Marketing Services Consultants At Defendant [4]

Defendant hired one female MSC, Vickie Day, and two male MSCs, Kevin Harriman and Mark Shelton, after it hired plaintiff. It is undisputed that both Harriman and Shelton had significantly more experience and significantly greater qualifications than plaintiff.

---

4. In her opposition to summary judgment, plaintiff asserts information regarding the positions and treatment of two additional female employees, Julie Hammer–Miller and Rhonda Kunz. The record reflects that neither Ham-

mer–Miller nor Kunz worked in positions identical to the other MSCs. Accordingly, the court finds the information regarding their positions irrelevant to the issues before the court and does not include it herein.

### 1. Susan (Nelson) Hairgrove

Hairgrove is a senior MSC at defendant. Hairgrove was promoted from a MSC to a senior MSC on May 16, 2001. As of May 2001, Hairgrove had been performing the MSC job at defendant for over seven years and her salary was $58,900. As of September 23, 2002, Hairgrove's base salary was $60,800. Defendant paid Hairgrove $51,732.45 in 2000, $59,088.07 in 2001, and $63,915.66 in 2002.

### 2. Vickie Day

Defendant hired Day as a level 13 MSC on October 9, 2000, at a starting salary of $50,000. When she was hired, Day had a college degree and had obtained her series 63 and 6 licenses. Day was previously employed by Northwestern Mutual Life Insurance, at an annual salary of $48,000, and had five years of full-time experience in the life insurance industry. Defendant paid Day $11,557.32 in 2000 (partial year), $53,495.26 in 2001, and $56,311.93 in 2002.

### 3. Mark Shelton

In late 2000, defendant hired Mark Shelton as a grade level 14 MSC, at a starting salary of $60,000. Plaintiff knows Shelton had several years of experience in the life insurance industry and that he had worked as an agent before defendant hired him. Plaintiff admitted in her deposition that Shelton had many more years of life insurance experience than she did.

The record reflects that Shelton had nearly 20 years of full-time experience in the life insurance industry prior to his employment with defendant, which was more experience than any other MSC at defendant. Shelton had been an agent early on in his career and later worked in the life insurance industry in a capacity similar to his job at defendant. Shelton's salary at his job immediately prior to defendant, which was not a position similar to the MSC job, was $45,000. Shelton had

previously earned $60,000 in a position similar to the MSC job. Defendant paid Shelton $2,307.70 in 2000 (partial year), $60,881.97 in 2001, and $65,730.54 in 2002.

### 4. Jim Wirtz

Jim Wirtz was promoted to a senior MSC at defendant in approximately April 2001. As of September 23, 2002, Wirtz's salary was $66,201. During her employment with defendant, plaintiff did not know Wirtz's exact salary and does not take issue with the amount of Wirtz's salary.

### 5. Kevin Harriman

Defendant hired Kevin Harriman on February 19, 2002. Prior to his hire, Harriman had worked as a desk trader and had his series 6, series 7 and series 63 licenses. Harriman was in the process of completing his MBA at the time he applied to defendant. Defendant contends that Harriman had familiarity with both marketing organizations as well as marketing and compliance issues associated with marketing variable products and that Harriman had nearly nine years of previous full-time experience in the life insurance industry. Plaintiff disputes that Harriman had any specific experience in marketing life insurance.

Harriman's salary, including his bonus, at his prior job was $55,000. At the time defendant hired Harriman, he had been laid off from his previous job. However, Harriman's previous employer had provided him with a severance package. Defendant contends that it was competing for Harriman with other companies and that defendant needed to offer Harriman $60,000 to be competitive.

Billings set Harriman's starting salary at $60,000, with input from Vavra and Begley. When Billings hired Harriman, she was not aware of the salaries of any other

sales team member, including plaintiff. Billings claimed that the decision to pay Harriman $60,000 was based on the value he added to the MSC team, his education, his skills, his experience, and the salary range into which he fell, and that Begley reviewed Harriman's salary only to see if it was within the range for a grade 13 employee. Vavra testified that he and Begley participated in setting the salaries of plaintiff, Harriman, Day, and Shelton.

Defendant contends that an additional consideration in setting Harriman's salary was the fact that he had experience in the broker/dealer market, which no other MSC possessed, because defendant hoped to expand into the broker/dealer market. In 2001, defendant introduced a variable product as part of an advanced market product series. Defendant expected to sell a significant amount of this product.[5] Defendant expected that Harriman would be able to contribute to the overall running of the internal sales unit by bringing skills and resources he had developed in the securities and variable product area prior to joining defendant.

Plaintiff did not know what management's plans were in terms of wanting expertise in the broker/dealer market at the time Harriman was hired. Defendant paid Harriman $52,944.21 in 2002 (partial year).

### D. Plaintiff's February 2002 Complaint

In early February 2002, plaintiff complained that she was being paid less than a male MSC, Kevin Harriman. On February 12, 2002, Vavra and Billings met with plaintiff to explain why Harriman had been offered a higher salary than plaintiff. During the meeting, Vavra gave plaintiff a list of four factors that explained the difference in hers and Harriman's salaries: experience, qualifications, market factors and salary history. Plaintiff was unsatisfied with defendant's response, and, on or about February 15, 2002, she sent a formal complaint to defendant's home office, with a copy to Begley. Defendant's human resources department conducted an internal investigation into plaintiff's complaint. LaDonna Carr in defendant's human resources department sent plaintiff a letter dated February 28, 2002, stating the results of the internal investigation and concluding that the difference in plaintiff's and Harriman's salaries was based on their different experience, salary histories, and completion of licensing exams.

### E. Alleged Retaliation

Plaintiff believes that, following her February 2002, complaint defendant engaged in a pattern of retaliatory behavior against her for making the complaint. Plaintiff alleges the following issues/incidents in support of her retaliation claim: delayed reimbursement of expenses; failure to move her to a desk by the window; separating her desk from Hairgrove's; separating plaintiff from her team in June 2002; berating plaintiff and accusing her of disrupting her department; being reprimanded and instructed not to discuss salary information with her co-workers; cancelled trips and restricted travel; Vavra's failure to find her a legal position with defendant; Billings telling plaintiff that she would not be compensated for time off to take the Kansas Bar Examination in February 2002; and being moved from the M financial team to the BGA group in November 2002. Plaintiff claims the pattern of retaliation eventually ended with defendant denying her request to work part-time and led to her termination of employment.

---

**5.** Defendant's expansion into the broker/dealer market was ultimately unsuccessful.

### Discussions About Other Employees' Salaries

It is undisputed that, during her employment, plaintiff told at least one other employee the amount of Harriman's salary. Plaintiff also told other employees the amount of her female supervisor's (Billings) salary. In February 2002, after plaintiff complained of salary discrimination, Billings reprimanded plaintiff for discussing her salary with other employees. Plaintiff apologized for telling people the amount of Billings' salary and said that she had exercised poor judgment in doing so. Plaintiff believes that Billings is overpaid and has no education or management experience. Plaintiff also made fun of Billings because she believed Billings was incompetent.

### August 29, 2002 Meeting

On August 29, 2002, plaintiff and Susan (Nelson) Hairgrove, another MSC, were called into a meeting with Vavra, Billings and Louis Gardner because plaintiff and Hairgrove were taking work from people other than Billings, their direct supervisor, and undermining Billing's ability to manage the MSCs. Plaintiff claims that, during the meeting, Vavra scared and intimidated her, and that she thought that she and Hairgrove were going to be fired.

### Cancelled Trips/ Disruption of Travel

Plaintiff recalls that some of her scheduled trips were cancelled. Plaintiff cannot recall why her trip to Boston in March 2002 was cancelled, but recalls that it was cancelled the day after she met with Billings and Vavra about her salary discrimination complaint in February 2002. Plaintiff cannot recall whether her cancelled Florida trip was ever rescheduled. Plaintiff knew the MSCs would be traveling less after Gardner was hired in Spring 2002, because Gardner wanted to travel with the field directors.

### Legal Position with Defendant

Before plaintiff made her salary discrimination complaint, she asked Vavra to look for legal opportunities for her at defendant. Plaintiff believes Vavra did not look for legal opportunities for her and that his failure to do so was retaliatory. Plaintiff does not know if Vavra actually looked for any legal-related opportunities for her. Vavra never reported back to plaintiff about any such openings.

### February 2002 Bar Examination

Plaintiff also believes that defendant retaliated against her when she sought time off to take a third bar examination in February 2002. Plaintiff claims that, in a conversation on February 14, 2002, Billings told plaintiff that defendant was not going to pay her for days off to study and take the bar exam the following week. Billings told plaintiff that she would need to use her vacation time. Previously, defendant gave plaintiff four paid days off to study for and take her first bar exam in Nebraska. However, it is uncontroverted that plaintiff's third time off to take a bar exam in February 2002, was coded the same way it had been coded the previous two times she sat for bar exams and that plaintiff was paid for the days off.

### Changes in Plaintiff's Positions

Plaintiff expressed interest to Gardner in being promoted to a field director in approximately April 2002. Gardner interviewed plaintiff for a field director position but did not select her for the position.

During his deposition, Gardner testified that he did not select plaintiff for a field director position because she had no prior experience as a field director with other carriers and no contacts or relationships with independent producers to which defendant marketed. In June 2002, Gardner hired a new field director, Mike Rothstein. Plaintiff does not know the extent of Roth-

stein's qualifications for the field director position.

In August or September 2001, plaintiff developed a personal, romantic relationship with the field director she supported, John Mickelson. On December 4, 2001, plaintiff sent an e-mail to Vavra, addressing the issue of her relationship with Mickelson. In that e-mail, plaintiff stated that defendant might need to reassign her because of the relationship. In June 2002, around the time that plaintiff and Mickelson got engaged, defendant moved plaintiff from supporting Mickelson to supporting a new field director in the M financial region. Plaintiff believes she was retaliated against when defendant moved her to a different team from Mickelson, because they were one of only two teams to have made their goal the previous year. Defendant contends that the June 2002 move was a result of plaintiff's good work at defendant, that plaintiff was given her own field director and her own territory on which to focus, and that plaintiff had previously acknowledged the possibility that she would need to be reassigned from her position with Mickelson because of their relationship. Plaintiff contends that the move resulted in her losing part of her region, being unable to work with Mickelson, and having to train a new field director.

In November 2002, soon after her engagement to Mickelson, plaintiff met with Billings and requested a promotion from her position supporting the M financial region to the key accounts position. The key accounts position acts as the liaison between defendant and key BGA offices. Plaintiff claims that she made the request to prevent customers wondering about two persons who were married, with the same last name, being on the same sales team. Plaintiff also requested that defendant consult her before moving her to a different region.

Billings did not move plaintiff to the key accounts position because no position was open or available at that time. No key accounts position became available until after plaintiff's position with defendant ended.[6]

On November 22, 2002, Billings spoke to plaintiff about moving to the Brokerage General Agencies Channel, to which plaintiff responded positively. Eventually, plaintiff was moved to this region. Plaintiff did not take issue with being moved from the M financial team; she simply did not like the position to which she was moved. Plaintiff contends that she acted positively about the change because it would not do her any good to fight it. During her deposition, plaintiff admitted that she may have liked the position if she had given it a chance.

### F. Plaintiff's Medical Leave and Termination

Plaintiff took FMLA leave on December 9, 2002. Plaintiff first notified defendant that she intended to return to work on January 13, 2003; plaintiff later extended her leave to February 10, 2003. It is undisputed that defendant properly calculated plaintiff's paid versus unpaid medical leave time. It is also undisputed that defendant properly calculated plaintiff's leave time under the FMLA. However, plaintiff contends that defendant failed to permit her to return to work part-time or to take intermittent leave under the FMLA.

On December 27, 2002, while plaintiff was on leave, she sent Billings an e-mail requesting that plaintiff be permitted to work part-time. Plaintiff's e-mail stated: "Tracie, is there any possibility of re-

---

**6.** Defendant moved Jim Wirtz, another MSC, to the key accounts position in July 2003 after Bill Farmer, who held the position during plaintiff's employment, retired.

turning to work part-time? My doctor thinks this would be a good step for me. Thanks, Jennie."

Plaintiff's medical leave was not related to a worker's compensation injury and was not a request for an opportunity to transition back to a full-time schedule. Defendant viewed plaintiff's December 27, 2002 request as one to work part-time indefinitely.

Billings discussed plaintiff's request with Begley. Both Begley and Billings viewed plaintiff's position as a full-time position. On January 9, 2003, Billings sent plaintiff a letter denying plaintiff's request to work part-time and stating that business demands and staffing requirements required plaintiff's position be filled by a regular, full-time employee.[7]

During her deposition, plaintiff testified that, in January 2003, one of her treating physicians, Dr. Campbell, suggested that plaintiff ask defendant if she could return to work part-time. However, at the time plaintiff's FMLA leave expired in February 2003, plaintiff had provided defendant with no document from any of her treating doctors releasing her to return to work— either full-time or part-time—upon the expiration of her medical leave. It is undisputed that plaintiff's doctors advised plaintiff against returning to work full-time.

Plaintiff did not return to work on February 10, 2003. When plaintiff did not return to work by February 10, 2003, defendant notified plaintiff that she had been expected to return to work on February 10, 2003, that her FMLA leave would be exhausted as of February 12, 2003, and gave plaintiff until February 20, 2003, to return to work or defendant would consider her to have abandoned her job. As of February 19, 2003, plaintiff did not know when or if she would be able to return to work, and plaintiff did not submit any documentation extending her return to work date. In fact, plaintiff sent defendant an e-mail on February 19, 2003, stating that her doctor had not cleared her to return to work and had advised her not to return to work at defendant.

Defendant involuntarily terminated plaintiff's employment on February 20, 2003, and circled "leave exhausted" as the reason for the termination on plaintiff's termination report. At that time, plaintiff's salary was $53,400. Defendant paid plaintiff $15,301.38 in 2000 (partial year), $54,232.49 in 2001, and $56,941.17 in 2002.

Plaintiff contends that defendant's refusal to permit her to work part-time was in retaliation for her prior complaint about salary discrimination.

Defendant contends that it is entitled to summary judgment on all of plaintiff's claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

7. Another MSC, Susan (Nelson) Hairgrove, was permitted to transition back to her full-time schedule while she recovered from a back injury covered by worker's compensa-

tion. However, plaintiff is not aware that anyone has worked part-time as a MSC in defendant's Leawood office on an indefinite basis.

242, 248, 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### III. Discussion

#### A. Salary Discrimination Claims

Plaintiff contends that defendant has violated both the EPA and Title VII by setting salaries of male MSCs higher than salaries of female MSCs. Specifically, plaintiff claims that two other male MSC's, Harriman and Shelton, were hired at $60,000, while plaintiff and another female MSC, Vickie Day, were hired at $50,000.[8]

#### 1. Equal Pay Act

To establish a prima facie case under the EPA, "[a plaintiff] has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; [and] (3) the male employees were paid more under such circumstances." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1364 (10th Cir.1997) (quoting *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir.1993)).

Once plaintiff establishes a prima facie case under the EPA, the burden shifts to defendant to establish that a pay disparity is the result of (1) a seniority system; (2) a

8. Plaintiff also argues that another female MSC, Hairgrove, was paid less than the male MSCs. As of May 2001, Hairgrove had been performing the MSC job at defendant for over seven years and her salary was $58,900, which, plaintiff points out, was $1,100 less than Shelton's, who had worked for defendant for less than six months at that time.

Defendant points out that Shelton had worked in the life insurance industry for nearly 20 years compared to Hairgrove's seven. Moreover, by September 23, 2002, Hairgrove's base salary was $60,800, which was more than Harriman's. The court finds plaintiff's arguments with regard to Hairgrove's salary unpersuasive.

merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a factor other than sex. 29 U.S.C. § 206(d)(1); *Sprague,* 129 F.3d at 1364.

■ For purposes of summary judgment, defendant does not dispute that plaintiff has proven her prima facie case under the EPA. Defendant claims that any pay disparity between plaintiff and male co-workers was based on factors other than sex. Because defendant bears the burden of proof on its defense, defendant may prevail at the summary judgment stage only if it proves its affirmative defense "so clearly that no rational jury could find to the contrary." *Klindt v. Honeywell Intern. Inc.,* 303 F.Supp.2d 1206, 1219 (D.Kan.2004) (quoting *Stanziale v. Jargowsky,* 200 F.3d 101, 108 (3d Cir. 2000)).

" 'Factors other than sex' is a broad principle which explicitly states that a differential based on factors other than sex does not violate the EPA." *Mehus v. Emporia State Univ.,* 222 F.R.D. 455, 477 (D.Kan.2004) (citing *Washington County v. Gunther,* 452 U.S. 161, 171 n. 11, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981)). Defendant must set forth conclusive evidence to prove that the disparity in pay between plaintiff and her male co-workers, Harriman and Shelton, was based on factors other than sex. *Id.* at 478.

■ It is undisputed that plaintiff and Day were hired at $50,000, while both Harriman and Shelton were hired at $60,000. Defendant claims that the disparity in starting pay between the female MSCs and the male MSCs was based on differences in experience and qualifications.

Viewing the facts in a light most favorable to plaintiff, plaintiff had, at the most, six and a half years of prior *part-time* experience in the life insurance industry before defendant hired her. More than three of those years was spent as a data prep clerk for LBL. Plaintiff had her law degree, but she did not have a series 6, 7, or 63 license.

It is undisputed that Day had five years of full-time experience in the life insurance industry prior to being hired by defendant. Day also had a college degree and her Series 63 and 6 licenses.

Shelton had nearly 20 years of prior full-time experience in the life insurance industry and had held jobs similar to the MSC position before defendant hired him.

Harriman had his series 6, 7, and 63 licenses, had a college degree and was completing his MBA degree, and had nearly nine years of prior full-time experience in the life insurance industry. Harriman also had experience in the broker market, where defendant was trying to develop business.

The record reflects that Vavra and Billings told plaintiff, after she made her complaint about the difference in her and Harriman's salaries in February 2002, that experience, qualifications, market factors, and salary history justified the difference in plaintiff's and Harriman's salaries. Defendant's internal investigation into plaintiff's formal complaint found that the difference in plaintiff's and Harriman's salaries was a result of different experience, salary histories, and completion of licensing exams. Defendant has consistently asserted that Harriman and Shelton were started at higher salaries than plaintiff or Day because Harriman and Shelton had several more years experience in the life insurance industry, and because of Harriman's and Shelton's qualifications. Harriman had at least four more years of full-time experience in the industry than did Day, and Shelton had at least fifteen more years of full-time experience in the industry than Day. In contrast, plaintiff had six and a half years of *part-time* experience, most of which was not in an

MSC position, plus her year and a half of full-time experience at defendant.

The court finds that defendant has shown that its consideration of the vast difference in years of experience and qualifications between plaintiff, Day, Harriman, and Shelton, as well·as of prior salary histories, was the reason for the disparity in pay between the MSCs. Accordingly, defendant is entitled to summary judgment on plaintiff's EPA claim.

### 2. Title VII

"[A] female Title VII plaintiff establishes a prima facie case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague*, 129 F.3d at 1363 (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994)). Once plaintiff establishes her prima facie case, "the defendant must articulate a 'legitimate, nondiscriminatory reason for the pay disparity.' This burden is 'exceedingly light'; the defendant must proffer non-gender based reasons, not prove them." *Id.* (quoting *Meeks*, 15 F.3d at 1019 (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1527 (11th Cir.1992))). Plaintiff must then show that "defendant, regardless of the proffered reasons, intentionally discriminated against her." *Id.*

■ It is undisputed that plaintiff has established her prima facie case under Title VII. Like its defense of the EPA claim, defendant has articulated legitimate, nongender based reasons for the pay disparity—differences in experience, qualifications, and prior salary history. Other than unsupported and conclusory allegations made by plaintiff and other female employees (some of whom were MSCs and some who were not), none of the evidence in the record reveals that defendant paid plaintiff less than the male MSCs because of her sex. Accordingly, defendant is entitled to summary judgment on plaintiff's Title VII discrimination claim.

### B. Retaliation for Complaints about Salary

To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in protected opposition to discrimination; (2) defendant subjected her to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996).

It is undisputed that plaintiff engaged in protected opposition to discrimination. However, defendant claims that the majority of the alleged retaliatory actions did not amount to adverse employment action. Defendant further contends that, even if plaintiff suffered an adverse employment action, no causal connection exists between plaintiff's February 2002 complaint and the adverse action.

■ The Tenth Circuit takes a case-by-case approach to considering whether certain actions constitute adverse employment actions. *See Trujillo v. N.M. Dep't of Corr.*, 182 F.3d 933, 1999 WL 194151, at *2 (10th Cir.1999). Conduct will qualify as an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Stover v. Martinez,* 382 F.3d 1064, 1071 (10th Cir.2004). However, "a mere inconvenience or an alteration of job responsibilities" is not an adverse employment action. *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998) (citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)); *Martinez,* 382 F.3d at 1071.

■ Having considered plaintiff's list of alleged retaliation, the court finds that defendant's actions toward plaintiff did not result in a significant change in her employment status, reassignment with significantly different responsibilities, or a change in her benefits. Rather, most of the conduct that plaintiff has listed—delayed reimbursement of expenses; failure to move her to a desk by the window; separating her desk from Hairgrove's; separating plaintiff from her team in June 2002; berating plaintiff and accusing her of disrupting her department; being reprimanded and instructed not to discuss salary information with her co-workers; cancelled trips and restricted travel; and Vavra's failure to find her a legal position with defendant—amounts to no more than inconvenience or altered job responsibilities. Plaintiff's employment status was not altered as a result of these actions, and plaintiff has not alleged that she experienced any change in her salary or benefits.

■ Moreover, even, when defendant reassigned plaintiff to the BGA group in November 2002, the record reflects that it was to a similar position with a different group, which merely altered her job responsibilities and did not change her status or her benefits. Notably, when defendant reassigned plaintiff, plaintiff had requested to be moved from the M financial region to the key accounts position. The key accounts position was not open at that time,

and when defendant consulted with plaintiff about the move to the BGA group, plaintiff did not object.

■ The court thus turns to plaintiff's claim that defendant's refusal to allow her to work part-time was an adverse employment action. In her opposition to summary judgment, plaintiff contends that her primary complaint of retaliation centers on defendant's denial of her December 2002 request to allow her to return to work part-time. Plaintiff contends that, had she been allowed to work part-time and essentially take intermittent leave, her FMLA leave would have lasted longer than it did, and she may have recovered so that she could return to work full-time and retain her job. While plaintiff may be arguing that defendant's refusal to permit plaintiff to work part-time after she had requested and been approved for FMLA leave violated defendant's FMLA policy or the FMLA itself, such claims are not before this court.

As the court has previously noted, an action will qualify as an adverse employment action if it is a significant change in employment status, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. When plaintiff sent her December 27, 2002 e-mail to Billings inquiring about part-time work, plaintiff had been on approved FMLA leave for 18 days, and was scheduled to return from leave on January 13, 2003. Plaintiff later extended her leave to February 10, 2003. As of February 19, 2003, plaintiff was unable to return to work. It is undisputed that defendant properly calculated plaintiff's FMLA leave and properly paid her for the leave. Defendant's denial of plaintiff's request to work part-time did not change her employment status or benefits. Plaintiff remained a MSC, with her full benefits, the entire time she was on FMLA leave. Because defendant's denial of plaintiff's request to work part-time does not qualify as

an adverse employment action under Title VII, plaintiff's retaliation claim fails.

Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 49) is granted.